# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-DP-00181-SCT

*ROGER LEE GILLETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/05/2007 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL DEFENSE COUNSEL BY: JAMES LAPPAN JONATHAN M. FARRIS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: PATRICK JOSEPH McNAMARA, JR. |
| DISTRICT ATTORNEY: | JON MARK WEATHERS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 07/01/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRAVES, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Roger Gillett was convicted and sentenced to die by lethal injection for the capital murders of Linda Heintzelman and Vernon Hulett during the commission of a robbery. Aggrieved by these convictions and sentences, Gillett now brings his direct appeal to this Court. Finding no reversible error, we affirm his convictions and sentences.

## FACTS

¶2.     The investigation into the deaths of Linda Heintzelman and Vernon Hulett began in Russell, Kansas. On March 29, 2004, Debbie Milam, Roger Gillett's aunt, informed the

Russell County, Kansas, Sheriff's Department that, on the previous day, Gillett had manufactured illegal narcotics at his grandfather's farm in rural Russell County (hereinafter "the Gillett farm") and also had stored at the farm a pickup truck he had stolen.[1] The Sheriff's Department contacted Agent Matthew Lyon, a narcotics investigator with the Kansas Bureau of Investigation (KBI), for assistance. Based on information received from Milam, as well as other corroborating information, Lyon sought out and obtained two search warrants: one to search the residence where Gillett was staying, located at 606 North Ash Street, Russell, Kansas, and one to search the Gillett farm, located at 5482 190th Street in rural Russell County, Kansas.

¶3. Upon executing the search warrant on 606 North Ash Street and locating illegal narcotics at the residence – as well as having reason to believe that Gillett had been involved in an assault, the manufacture of illegal narcotics, and a robbery – officers from the Sheriff's Department located and arrested Gillett, along with his codefendant, Lisa Chamberlin (*see Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008)), at a local park. The officers transported Gillett to the Russell County Jail, where he was interviewed by Agent Lyon. Before commencing the interview, Lyon showed Gillett a copy of the search warrant for 606 North Ash Street and read Gillett his *Miranda*[2] rights. During the interview, Gillett told Lyon that he recently had hitchhiked back to Kansas from Hattiesburg, Mississippi, where he had been

---

[1] Milam felt compelled to inform the police about the crimes Gillett had committed because, according to her, while at the Gillett farm, Gillett had threatened her with a gun, telling her he would shoot her and her family if she told anyone what she had seen at the farm.

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

staying with his relative, Vernon Hulett, for one or two months. He also told Lyon that he had not been up to the Gillett farm in months. Then, upon Lyon telling Gillett that a white pickup truck with Mississippi tags had been reported stolen, Gillett stated that he needed to speak with an attorney. However, as Lyon was preparing to take Gillett back to jail because Gillett had invoked his right to an attorney, Lyon told Gillett what he was being charged with and "that there might be some more charges that come out of it." Curious, Gillett asked, "Like?" and then withdrew his request for an attorney in order to learn more about the information Lyon possessed. The interview then continued for a significant period of time until Gillett again invoked his right to an attorney.

¶4.    That same day, March 29, 2004, the search warrant on the Gillett farm also was executed. In a metal shed at the farm, officers located a white pickup truck that was found to be registered to Linda Heintzelman (Vernon Hulett's live-in companion), as well as items consistent with the manufacture of methamphetamine. In a wooden shed at the farm, officers located a freezer that was bound shut with duct and electrical tape. When officers opened the freezer, they saw a dead body or bodies inside. The officers then temporarily stopped the search until they could obtain a homicide search warrant. Once they had secured a homicide search warrant on the farm, they removed from the freezer what turned out to be two bodies, a male and a female, and prepared them for transportation to the pathologist's facility.

¶5.    Gillett was not interviewed further regarding the bodies found in the freezer; however, Chamberlin gave officers a statement and led them to a location in a local landfill where, according to her, she and Gillett had disposed of trash bags containing property associated

3

with the murder victims.[3] The seven trash bags that the officers collected from the landfill contained, among other things, Vernon Hulett's and Linda Heintzelman's wallets containing their drivers licenses, Hulett's work shirt and work pants, both with his name printed on them, a crocheted pillow appearing to have blood on it (later found to match other pillows on Hulett's and Heintzelman's bed in their Hattiesburg home), a Hattiesburg phone book, and a pair of New Balance tennis shoes with blood-like stains on them.

¶6. Based on the evidence recovered, the Kansas officers contacted the Hattiesburg police and asked them to check the residence shared by Vernon Hulett and Linda Heintzelman, located at 908 South Gulfport Street, Hattiesburg, Mississippi. Hattiesburg officers subsequently searched the residence and found, among other things, carpeting removed from the floor and rolled up, multiple blood-like stains throughout the house, a pried-open safe, and a shoe print in a reddish stain. The Mississippi Crime Laboratory determined that one of the New Balance shoes recovered from the garbage bags at the Kansas landfill was the source of the shoe print found at the 908 South Gulfport Street residence. The Mississippi Crime Laboratory also determined that blood on the shoe was Linda Heintzelman's blood.

¶7. At trial, it was revealed that Gillett and Chamberlin had driven a blue Mitsubishi Eclipse from Kansas to Mississippi around the end of February 2004, and had been staying at the Hattiesburg home of Vernon Hulett, Gillett's cousin, and Linda Heintzelman, Hulett's

---

[3] Testimony of an employee at the Russell landfill confirmed that Gillett, accompanied by a female, had made two deliveries to the landfill on March 26, 2006. According to the employee, Gillett had requested that she put his aunt's name on the landfill receipts.

companion. One day, while Gillett, Chamberlin, Hulett, and Heintzelman were on their way to the Mississippi Gulf Coast, with the couples driving their respective vehicles, Chamberlin's and Gillett's Mitsubishi was damaged in a wreck, allegedly caused by Heintzelman cutting them off and forcing them into a ditch. Gillett was very angry about the car wreck, even telling Hulett's mother after the wreck that he, Gillett, would like to take Heintzelman and push her through a plate-glass window.

¶8. The last time anyone saw Hulett and Heintzelman alive was on March 19, 2004. When Hulett's nephew came by Hulett's house on March 20, he found only Gillett and Chamberlin there. Gillett told the nephew that Hulett and Heintzelman had gone to the Coast with a friend. Similarly, when the nephew stopped by Hulett's house on March 21, he found only Gillett and Chamberlin there. While visiting with Gillett and Chamberlin that day (March 21), the nephew noticed that the carpeting had been ripped up, and when he inquired about it, Gillett told him that Hulett had asked him to rip it up because Hulett had come into some money and was bringing new carpeting back with him from the Coast. The nephew also saw Gillett and Chamberlin in Hattiesburg on March 23.

¶9. Shortly thereafter, Gillett and Chamberlin arrived in Kansas, driving Heintzelman's white pickup truck. In the bed of the truck, there was a rectangular object that looked like boxes, covered by a tarp. In Kansas, Gillett informed two of his friends that he had taken the truck from its owners, that he had killed the owners, and that the owners were in the back of

5

the truck.[4] One of the friends to whom Gillett confessed soon thereafter went to the Gillett farm and observed in one of the farm's sheds a freezer that, according to him, looked like what might have been under the tarp in the back of the white pickup truck that Gillett had been driving. At the trial, Hulett's mother identified the freezer found at the farm to be the freezer that belonged to Hulett and Heintzelman, and she stated that she had last seen the freezer at Hulett's and Heintzelman's residence in Hattiesburg. Further, a KBI forensic scientist found Gillett's fingerprints on the freezer, as well as on both the "sticky" and "shiny" sides of the tape that bound the freezer shut.

¶10. The pathologist who conducted the autopsies of Hulett and Heintzelman found Heintzelman to have suffered at least sixty-nine separate injuries prior to death, including injuries caused by blunt-force trauma, cutting, stabbing, and suffocation. The pathologist summarized:

> Ms. Linda Heintzelman died from the multiple injuries that were inflicted upon her. Those included sharp-force injuries predominantly to the torso. Those included blunt-force injuries predominantly to the head. There were also sharp-force injuries to the neck. And there was also a component of asphyxiation or lack of oxygen getting into the airway.

The pathologist found Hulett to have suffered numerous injuries as well, predominantly to his face and head. The pathologist concluded that Hulett's death was the result of "blows that went to the left side of the head[,] fractured the skull and then damaged the brain."

---

[4] One of the two friends testified that the portion of the conversation she had heard between Gillett and the other friend was that Gillett needed help getting rid of the white pickup truck, because two dead bodies were in the back.

Hulett was found in the freezer, and presented to the pathologist, with his arms severed at the shoulder joints and his head severed at the neck.

## PROCEDURAL HISTORY

¶11.    Gillett was indicted on two counts of capital murder in the deaths of Vernon Hulett and Linda Heintzelman.  On October 15, 2004, in the Circuit Court of Forrest County, Mississippi, Gillett was appointed counsel and arraigned.  Gillett filed four pretrial motions to suppress: a motion to suppress his arrest; a motion to suppress his statement; a motion to suppress the search of the residence where he was staying in Kansas, located at 606 North Ash Street; and a motion to suppress the search of the Gillett farm.  On January 22, 2007, these motions were heard, with several Kansas law enforcement officers testifying regarding Gillett's arrest, his statement, and the searches of 606 North Ash Street and the Gillett farm. The trial court denied all four suppression motions.  On subsequent dates, the trial court heard and ruled on (or withheld ruling on) numerous other defense motions.  These included a motion, relevant to an issue discussed below, arguing that the State should be prohibited from introducing photographs of the victims' dead bodies.  The trial court denied that motion.  On September 20, 2007, the trial court held a ***Daubert***[5] hearing regarding the reliability of the testimony of one of the State's witnesses, William Jones, a DNA scientist from the Mississippi Crime Laboratory.  The trial court found that Jones met the ***Daubert*** criteria and denied Gillett's motion to exclude Jones' testimony.

---

[5] ***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

7

¶12. After a four-day trial, spanning from October 30, 2007, to November 2, 2007, during which Gillett did not put on any evidence, the jury found Gillett guilty of two counts of capital murder. On November 3, 2007, the penalty phase was conducted. Gillett called four witnesses (two religious leaders who had provided Gillett with religious guidance while he was incarcerated, one of Gillett's fellow inmates, and one of Gillett's aunts) and also played videotape testimony of four additional witnesses (a former employer of Gillett, a former friend of Gillett, the woman who had been Gillett's grandfather's live-in companion before he died, and Gillett's mother). At the conclusion of the penalty phase, the jury unanimously found beyond a reasonable doubt that four aggravating circumstances existed with respect to each victim,[6] and that Gillett should suffer death in both counts of capital murder. On January 25, 2008, the trial court denied Gillett's motion for a new trial, or in the alternative, a motion for a new sentencing hearing. Gillett then timely appealed to this Court.

## DISCUSSION

¶13. This Court reviews convictions upon indictments for capital murder and sentences of death with heightened scrutiny. *Loden v. State*, 971 So. 2d 548, 562 (Miss. 2007). Under this standard of review, "all doubts are to be resolved in favor of the accused because what

---

[6] The jury's verdict listed the four aggravating circumstances as follows: 1) "the capital offense was committed while the defendant was engaged or was an accomplice in the commission of or an attempt or flight after committing or attempt to commit a robbery;" 2) "the capital offense was heinous, atrocious, or cruel;" 3) "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest;" and 4) "the defendant was previously convicted of a felony involving the use of or threat of violence to the person."

8

may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Id.* (internal citations omitted).

*PRETRIAL*

**Prefatory choice-of-law question.**

¶14.    Gillett argues that this Court must determine whether the law of Kansas or the law of Mississippi applies to the adjudication of his first four claims (which regard his suppression motions) or must remand this matter to the trial court for that determination. Gillett submits that there is no Mississippi case precedent discussing this question. Gillett thus provides citations to cases in other jurisdictions, some of which hold that the law of the place where the transaction (e.g., search, seizure, arrest) occurred should apply, and others holding that the law of the jurisdiction where remedy is sought should apply. Gillett submits that his motions to suppress are meritorious under the law of the evidence-gathering state (Kansas), under the law of the forum state (Mississippi), and under federal law; however, Gillett contends that the most rational path for the adjudication of foreign searches and seizures is to apply the law of the place where the transaction occurred (Kansas).[7]

---

[7] Gillett's appeal brief states that neither the State nor the trial court addressed the issue of whether the law of Mississippi or the law of Kansas should apply. Gillett explains:

> As the State of Mississippi offered no response to Mr. Gillett's memoranda of law in support of suppression [which contained argument mandating suppression under the law of Kansas, the law of Mississippi, and federal law], the State necessarily took no position on the choice-of-law question.
> As the trial court issued no findings of fact nor conclusions of law concerning any aspect of suppression [i.e., concerning Gillett's four suppression motions], the trial court also remained silent on the choice-of-law question.

9

¶15. Neither party argues that applying the law of Mississippi rather than the law of Kansas, or vice versa, would result in different conclusions regarding Gillett's motions to suppress. Therefore, this choice-of-law question need not be addressed.

**I. Whether the trial court erred in denying Gillett's motion to suppress the warrantless arrest of Gillett and the seizures incident thereto.**

¶16. Gillett's first assignment of error is that the trial court erred in denying his motion to suppress his warrantless arrest and the seizures incident thereto. On March 29, 2004, Sergeant Kelly Schneider of the Russell County Sheriff's Department learned from interviewing Debbie Milam, Gillett's aunt, and Kathy Thacker, Milam's housemate, that Gillett had threatened Milam with a gun and was in possession of a stolen vehicle and materials used to manufacture methamphetamine. Schneider contacted KBI agent Matthew Lyon regarding what Thacker and Milam had told him. Based on the information received from Milam, as well as information from other sources, Lyon then applied for and obtained a search warrant for 606 North Ash Street, Russell, Kansas – the residence of Patty Hulett, Gillett's aunt, where Gillett was staying while in Russell. The warrant listed five felony crimes associated with methamphetamine, which Lyon had probable cause to believe had been or were being committed.

¶17. Schneider participated in the execution of the search warrant on 606 North Ash Street, assigned to duty on the perimeter. When officers entered the residence, they located narcotics, but Gillett was not present at the residence. Schneider (who was on duty outside

---

The trial court transcript does not contain discussion of this choice-of-law question.

the residence) was informed that narcotics had been located and that he, along with other officers, should attempt to locate and arrest Gillett. The County Attorney instructed the officers to arrest Gillett without a warrant because of the quantity of narcotics found at 606 North Ash Street and because of the threat made to Milam. Officers located Gillett at a public park in Russell and arrested him at the park, based on probable cause. Schneider informed Gillett that he was being arrested for "narcotics violations." After Gillett's arrest, Gillett was transported to the Russell County Jail where he was shown a copy of the search warrant for 606 North Ash Street, which listed the crimes he was suspected of having committed: manufacture of methamphetamine, conspiracy to manufacture methamphetamine, possession of methamphetamine, possession of drug manufacturing paraphernalia, and possession of pseudoephedrine.

¶18. The following day, March 30, 2004, a warrant for Gillett's arrest was obtained, listing the above charges. Kelly Ralston, Special Agent in Charge with the KBI, testified that it is not unusual in Kansas for officers to make an arrest on probable cause and later complete the formal paperwork; in fact, a Kansas statute specifically allows for arrests based on probable cause. *See* Kan. Stat. Ann. § 22-2401 (Rev. 2007).

¶19. Kansas Statutes Section 22-2401 provides:

> A law enforcement officer may arrest a person under any of the following circumstances:
> (a) The officer has a warrant commanding that the person be arrested.
> (b) The officer has probable cause to believe that a warrant for the person's arrest has been issued in this state or in another state for a felony committed therein.

(c) The officer has probable cause to believe that the person is committing or has committed:

> (1) A felony; or
> (2) A misdemeanor, and the law enforcement officer has probable cause to believe that:
>> (A) The person will not be apprehended or evidence of the crime will be irretrievably lost unless the person is immediately arrested;
>> (B) the person may cause injury to self or others or damage to property unless immediately arrested; or
>> (C) the person has intentionally inflicted bodily harm to another person.

(d) Any crime, except a traffic infraction or cigarette or tobacco infraction, has been or is being committed in the officer's view.

Kan. Stat. Ann. § 22-2401 (Rev. 2007).

¶20.    Gillett argues that it was unconstitutional and a violation of Kansas Statutes Section 22-2401 for the Kansas officers to arrest him without a warrant, because the arresting officer told him he was being arrested for a "narcotics violation," without elaborating as to whether the violation was a misdemeanor or a felony, and because he did not possess narcotics in the arresting officer's presence.  Gillett then argues that, because the arrest was unlawful, the items seized from his person incident to his arrest, as well as the custodial statement he provided incident to his arrest, should have been suppressed.

¶21.    When reviewing a trial court's denial of a motion to suppress, this Court adopts a mixed standard of review. ***Dies v. State***, 926 So. 2d 910, 917 (Miss. 2006). Determinations of reasonable suspicion and probable cause are reviewed *de novo*. ***Id.*** (citing ***Ornelas v. United States***, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996); ***Floyd v. City of Crystal Springs***, 749 So. 2d 110, 113 (Miss. 1999)).  However, this Court should "take

12

care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Floyd*, 749 So. 2d at 113 (citing *Ornelas*, 517 U.S. at 699). "Thus, this Court is restricted to a de novo review of the trial judge's findings using the applicable 'substantial evidence'/'clearly erroneous' standard." *Floyd*, 749 So. 2d at 113. Finally, this Court reviews the admission or exclusion of evidence for abuse of discretion. *Floyd*, 749 So. 2d at 113.

¶22. The United States Supreme Court has explained:

> Both the standard for arrest and detention have been derived from the Fourth Amendment and its common-law antecedents. The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.' This standard, like those for searches and seizures, represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime.

*Gerstein v. Pugh*, 420 U.S. 103, 111-12, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975) (internal citations omitted). This Court has held that:

> the test for probable cause in Mississippi is totality of the circumstances. . . . This Court has further defined probable cause as: "a practical, nontechnical concept, based upon the conventional considerations of every day life on which reasonable and prudent men, not legal technicians, act. It arises when the facts and circumstances within an officer's knowledge, or of which he has reasonably trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it."

*Moore v. State*, 986 So. 2d 928, 934 (Miss. 2008) (internal citations omitted).

13

¶23. We find that: 1) the record reveals that there was probable cause to arrest Gillett, and 2) thus, the items seized from Gillett's person incident to his arrest and the custodial statement he provided incident to his arrest were lawful and should not have been suppressed. Therefore, the trial court's denial of Gillett's motion to suppress his warrantless arrest and the seizures incident thereto was not clearly erroneous nor contrary to the substantial evidence before it.[8]

¶24. Gillett additionally argues that, under ***Ornelas v. United States***, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996), and Federal Rule of Criminal Procedure 12(d), the trial court's ruling stating that "[t]he suppression motions, namely Motion 005 [regarding the legality of the warrantless arrest], 006, 007, and 008 are denied," without further elaboration, is an insufficient ruling for review by this Court. Gillett argues that the trial court was required to make findings of historical facts, which are the salient events leading up to the stop or the search (or in this case, the arrest). First, ***Ornelas*** does not state that a trial judge is required to make on-the-record findings of historical fact before ruling on a motion to suppress evidence. Second, the Federal Rules of Criminal Procedure are not applicable in this case; Gillett even admits that "Mississippi has no analogue for Federal Rule of Criminal Procedure 12(d) [and] . . . Mississippi trial courts are not required to issue any findings of fact to support a suppression determination."

---

[8] Before ruling on Gillett's suppression motion, the trial court heard testimony from the officers involved in the search of 606 North Ash Street and Gillett's arrest, as well as those involved in securing the search warrants, and later, the arrest warrant. The trial court also possessed Gillett's memorandum on this issue, which includes Kansas Statutes Section 22-2401.

14

**II. Whether the trial court erred in denying Gillett's motion to suppress his custodial statement.**

¶25.    Gillett's next assignment of error is that the trial court erred in denying his motion to suppress his custodial statement. On March 29, 2004, shortly after Gillett's arrest, Agent Lyon was tasked with interviewing Gillett regarding the narcotics violation and the suspected stolen vehicle. Lyon set up a video camera to tape the interview and, before beginning the interview, informed Gillett that the interview was being taped. Soon after Gillett entered the interview room, Lyon showed Gillett a copy of the search warrant issued for 606 North Ash Street. Gillett looked it over, reading through the pages. Lyon then proceeded to read Gillett his *Miranda* rights as they were listed on the "*Miranda* Card." *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). As Lyon read the rights aloud, he asked if Gillett had any questions about the rights, and he had Gillett initial next to each enumerated right. Lyon then asked Gillett the following question as it is written on the *Miranda* Card: "Having these rights in mind, are you willing to answer questions now?" In response, Gillett placed an "X" on the *Miranda* Card, not in the box indicating "YES" (the box being to the left of the word "YES"), but rather directly to the right of the word "YES," in the white space between the word "YES" and the box indicating "NO."[9] To clarify whether Gillett wanted to talk, Lyon asked, "Ok, so you want to go ahead and talk for a little bit, then, right?"

---

[9] After Gillett drew the "X" where he did, Lyon said, "Go ahead and put it in the square there," and Gillett responded by saying something that sounded like "It's a 'Yes.'" It is difficult to decipher from review of the videotape exactly what Gillett said at that moment in the interview.

15

Gillett responded, "Maybe." Lyon then asked, "Ok, will you sign at least then that you'll talk to me for a little bit?" Gillett then signed and dated the card and asked, "What's this about?"

¶26.   Lyon and Gillett then proceeded to have an exchange regarding: from where, with whom, and by what form of transportation Gillett had traveled to Kansas the previous week; with whom Gillett had stayed while in Hattiesburg, and for how long he had stayed there; which of the belongings seized from 606 North Ash Street were Gillett's; what his backpack seized from 606 North Ash Street contained; and when Gillett had last been to the Gillett farm. Lyon also told Gillett that the police were getting ready to serve a search warrant at the Gillett farm because they had been keeping the farm under surveillance and suspected that there might be a stolen vehicle from Mississippi at the farm.[10]

¶27.   Right after Lyon told Gillett that a white pickup truck with Mississippi tags had been reported stolen, Gillett said, "I need to speak with an attorney." The following exchange, as transcribed in one of Gillett's exhibits, then occurred:

> Lyon: Ok. Well, that's fine. I'll go ahead and take you back to the jail. What this is all about is you're under arrest right now for the manufacture of methamphetamine, conspiracy to manufacture methamphetamine, possession of pseudoephedrine with intent to manufacture, possession of drug manufacturing paraphernalia. That's what you're being charged with now on account of last night, and um, there might be some more charges that come out of it. Um –
>
> Gillett: Like?

_____

[10] The Kansas authorities had not in fact been keeping the Gillett farm under surveillance. Lyon told Gillett that they had only so that Lyon would not have to reveal to Gillett that Milam had served as an informant. Lyon wanted to protect Milam.

Lyon: Well we're going to have to see. You asked for an attorney. So I can't really discuss it anymore, unless you want to change your mind. I'd like to discuss it with you and get it cleared up but I don't know if I, you know – If I got the wrong guy, I got the wrong guy.

Gillett: But you're already charging me with these things –

Lyon: Well, I haven't gotten the affidavit for arrest warrant yet.[11] That's the way it looks for preliminarily now, but I wanted to get your side of it, but since you asked for an attorney. You want to talk some more?

Gillett: What other charges are you trying to throw at me?

Lyon: Well I'm not trying to throw anything at you, but I want to completely come clean with you, but I can't. You asked for an attorney. I can't say anything right now.

Gillett: All right. Hold up on that for a minute.

Lyon: Ok, you don't want an attorney?

Gillett: Not this instant.

Lyon: Ok, so you're withdrawing –

Gillett: (indecipherable)

Lyon: Well I got to ask because . . .

Gillett: Yes, I'm withdrawing my request for an attorney.

Lyon: Outstanding.

---

[11] Review of the videotape of the interview reveals that, at this point, Lyon said "Well, I haven't *done an* affidavit for arrest warrant yet. . . ." (Emphasis added.)

The interview then continued until Gillett again asked for an attorney, and Lyon then promptly ended the interview. Lyon's testimony at the pretrial motion hearing was consistent with this transcription of the custodial interview.

¶28. Gillett argues that his entire custodial statement is inadmissible because he never waived his Fifth Amendment right to silence nor his Sixth Amendment right to counsel, and therefore, the trial court erred in denying his motion to suppress the statement. Gillett further argues that, even if this Court were to find that Gillett had waived his right to silence and counsel at the start of the interview, the trial court erred in denying his motion to suppress his custodial statement after the point in the interview when he first explicitly invoked his right to counsel.

¶29. This Court has stated that a heavy burden must be met for a trial court's decision regarding a motion to suppress to be overturned. *Taylor v. State,* 789 So. 2d 787 (Miss. 2001). This Court has elaborated:

> A trial court is also given deference in the admissibility of an incriminating statement by a criminal defendant. In *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996), this Court held that the defendant seeking to reverse an unfavorable ruling on a motion to suppress bears a heavy burden. The determination of whether a statement should be suppressed is made by the trial judge as the finder of fact. *Id.* "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Balfour v. State*, 598 So. 2d 731, 742 (Miss. 1992); *Alexander v. State*, 736 So. 2d 1058, 1062 (Miss. Ct. App. 1999).

*Baldwin v. State*, 757 So. 2d 227, 231 (Miss. 2000).

¶30.   An officer must secure a *Miranda* waiver before beginning a custodial interrogation

if the officer intends to use any of the information acquired from the interview as evidence.

*Miranda* explains:

> Once warnings have been given, the subsequent procedure is clear.  If the
> individual indicates in any manner, at any time prior to or during questioning,
> that he wishes to remain silent, the interrogation must cease. . . . If the
> individual states that he wants an attorney, the interrogation must cease until
> an attorney is present. . . . If the interrogation continues without the presence
> of an attorney and a statement is taken, a heavy burden rests on the
> government to demonstrate that the defendant knowingly and intelligently
> waived his privilege against self-incrimination and his right to retained or
> appointed counsel. . . . An express statement that the individual is willing to
> make a statement and does not want an attorney followed closely by a
> statement could constitute waiver. . . .

*Miranda v. Arizona*, 384 U.S. 436, 473-75, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶31.   As noted above, at the start of the custodial interview, Lyon read Gillett his *Miranda*

rights and had him initial next to each right listed on the *Miranda* Card to indicate that he

fully understood his rights.  When asked if, having his rights in mind, he was willing to talk,

Gillett gave an ambiguous response by marking an "X" on the *Miranda* Card between the

"YES" and "NO" boxes.  Lyon then asked the clarifying question, "Ok, so you want to go

ahead and talk for a little bit, then, right?"  Gillett responded, "Maybe."  Lyon then again

attempted to clarify whether Gillett wanted to talk by asking, "Ok, will you sign at least then

that you'll talk to me for a little bit?"  Gillett then signed and dated the card and asked,

"What's this about?"  Gillett never indicated in any manner at any time prior to or during

questioning that he desired to remain silent, as he was required to do under *Miranda* to

invoke his right to silence.  *Miranda*, 384 U.S. at 473-74.

19

¶32. Because Gillett did not invoke his right to silence, the interview proceeded for a significant amount of time until, after learning that the police were getting ready to serve a search warrant on the Gillett farm and that they suspected there might be a stolen vehicle there, Gillett invoked his right to an attorney by stating, "I need to speak with an attorney." After Gillett made this statement, Lyon immediately ceased questioning him, told him he would return him to jail, and told him what the charges against him were (as they were listed on the search warrant for 606 North Ash Street, which Gillett reviewed at the start of the interview), and that there may be additional charges. Gillett then asked, "Like [what additional charges]?," but Lyon told Gillett that, because Gillett had invoked his right to counsel, Lyon could not speak with him further about the matter, unless he withdrew his request for an attorney. Shortly thereafter, Gillett explicitly withdrew his request for an attorney, stating "Yes, I'm withdrawing my request for an attorney." The interview then proceeded for between ten and fifteen minutes until Gillett again invoked his right to counsel, and Lyon promptly ended the interview.

¶33. *Smith v. Illinois* explains that "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on the finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). As discussed, Gillett did just that; he initiated further discussions with police by asking "Like [what additional charges]?," and then knowingly and intelligently waived the right to counsel he had invoked.

20

¶34.    Gillett argues that Lyon's informing Gillett of the charges against him after Gillett had invoked his right to counsel constituted continued interrogation; however, that argument is without merit.   The U.S. Supreme Court explained in *Rhode Island v. Innis* that "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 303, 100 S. Ct. 1682, 1690, 64 L. Ed 2d 297 (1980) (emphasis in original).   Lyon's statement informing Gillett of the charges against him was not a statement that Lyon "should have known was reasonably likely to elicit an incriminating response." *Id.* (emphasis removed).   When Lyon verbally told Gillett what the charges against him were, Lyon was not informing Gillett of anything Gillett had not already had an opportunity to read in the search warrant for 606 North Ash Street, which Lyon had given Gillett to review at the start of the interview.   Notably, at the time of the interview, Lyon did not know that anyone had been murdered.

¶35.    Therefore, the trial court's denial of Gillett's motion to suppress his custodial statement was not manifest error nor was it contrary to the overwhelming weight of the evidence.

### III.   Whether the trial court erred in denying Gillett's motion to suppress seizures from the warranted search of 606 North Ash Street.

¶36.    Gillett's next assignment of error is that the trial court erred in denying his motion to suppress items seized from the warranted search of 606 North Ash Street, Russell, Kansas, the residence of Gillett's aunt, Patty Hulett, with whom Gillett was staying while in Russell.

21

On March 29, 2004, Agent Lyon secured a search warrant for 606 North Ash Street. Lyon's affidavit for the search warrant explained that Lyon had more than twenty years of narcotics investigation experience and listed the unique knowledge Lyon had because of that experience. The affidavit then informed the court that:

> At approx. 11:15am on 03-29-2004, SSA LYON and SA Sherri MOORE interviewed Debbie Lynn MILAM at the Russell County Sheriff's Office (SO).
> MILAM advised of the following:
>
> MILAM was not under the influence of alcohol or any other drug. She last used methamphetamine approx. six years ago. She is the aunt of Roger Lee GILLETT.
>
> GILLETT drove to Russell, Ks on 03-26-2004.
>
> On 03-28-2004, during the evening hours, GILLETT and his girlfriend, Lisa Jay [*sic*] CHAMBERLIN, had MILAM drive them, in MILAM's vehicle, to MILAM'S uncle's abandoned farm, located at the northeast corner of section 33, Township 11 South, Range 13 West, Russell County, Ks, commonly known as 5482-190th St. MILAM observed GILLETT get in a white pickup truck, which he placed in a shed. MILAM then slept in her vehicle. When she awoke, she could smell a strong odor. GILLETT had a trash bag with him. He showed her a firearm, and advised that if she told anyone what he was doing, he would kill her.
>
> GILLETT and CHAMBERLIN entered MILAM'S vehicle with the trash bag. He had MILAM drive back roads to Bunker Hill, Ks, to dispose of the trash. He then changed his mind, and had MILAM drive to Russell. MILAM asked him if he wanted to throw the trash bag in her trash, and he advised he did not want to put it in her trash. He directed her to drive to the Russell City swimming pool, where he threw the trash bag in the dumpster at the pool. MILAM then drove GILLETT and CHAMBERLIN to 606 North Ash, Russell, KS, where he stays when he is in Russell.
>
> GILLETT advised MILAM of the following:

22

GILLETT needed to obtain a storage unit to hide the pickup truck that was at the above farm house. It was stolen from Mississippi. He had left "D" in MILAM's vehicle. He had "stuff" on him now. The FBI was looking for him, as he had committed computer crimes in Oregon. He had obtained computers and false identification for drug dealers there.

SSA Lyon determined that there was an active felony warrant for GILLETT in Pendleton, Umatilla County, Oregon, for the following:

7 Counts of forgery in the first degree.
5 Counts of theft in the first degree.
26 Counts of identity theft.
41 Counts of Computer crime.

Russell County SO Deputy Kelly SCHNEIDER advised that MILAM showed him items she had observed at the farm house. These items were consistent with that of a clandestine methamphetamine laboratory. Deputy SCHNEIDER further advised of the following:

ON 02-17-2004, Russell County Deputy Fred WHITMAN conducted a traffic stop on CHAMBERLIN'S vehicle. He found her in possession of an 18 ounce bottle of Red Devil Lye, a 32 ounce bottle of Sunnyside Muriatic Acid, a small quantity of green vegetation and other drug paraphernalia.

MILAM showed SA MOORE the bag in the above dumpster. SA MOORE retrieved it. KBI SA Brian Carroll advised there was a methamphetamine laboratory in the trash bag. MILAM signed a consent to search her vehicle. Deputy SCHNEIDER advised he found a propane tank in her vehicle as well as ammonium sulfate and sodium hydroxide in the trash. SSA LYON knows that these chemicals are consistent with the manufacture of anhydrous ammonia.

Russell County Sheriff John FLETCHER advised that Russell County Undersheriff Max BARRETT had spoken to a neighbor near the above farm house. The neighbor had observed the above white pickup at the farm house on 03-25-2004 or 03-26-2004.

SSA LYON had interviewed GILLETT in 1993, after GILLETT had been arrested by the Osborne County SO for possession of marijuana. He advised SSA LYON that he had been fronted the marijuana that he had been caught with, and owed money for it.

23

Therefore, the undersigned requests that a search warrant be issued for the items described herein, as provided by law.

¶37. Gillett argues that the affidavit in support of the warrant was wholly conclusory, and as a result, the seizures made on the warrant were absent probable cause. Gillett also contends that the affidavit failed to contain sufficient, particularized facts from which the magistrate judge could have found a substantial basis for probable cause. Gillett argues that the items seized from the search of 606 North Ash Street should be suppressed because they were based on uncorroborated information from an informant whose reliability was not established, and they are unconstitutional under the United States, Kansas, and Mississippi constitutions.

¶38. This Court has held that:

In determining whether the issuance of a search warrant is proper, an appellate court will review the trial judge's decision to determine whether there was a substantial basis for concluding that probable cause existed. The reviewing court will overturn the trial court if there is an absence of substantial credible evidence to support the issuance of the search warrant.

*Culp v. State*, 933 So. 2d 264 (Miss. 2005) (internal citations omitted); *see also* ***Roach v. State***, 7 So. 3d 911, 917 (Miss. 2009) (where this Court stated that, in reviewing a magistrate's finding of probable cause, this Court does not apply a de novo standard of review, but rather examines whether there was a substantial basis for the magistrate's determination). Further, this Court applies a "totality of the circumstances" analysis to determinations of probable cause. *Lee v. State*, 435 So. 2d 674, 676 (Miss. 1983). This Court has elaborated:

24

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.*

¶39. As is evident from the portion of Lyon's affidavit included above, there was a substantial basis for the magistrate judge and the trial court to conclude that probable cause existed. As noted above, Debbie Milam, Gillett's aunt, informed Lyon that just the previous day, she had witnessed Gillett engaged in the manufacture and possession of illegal narcotics and in the possession of a stolen vehicle. In addition, Gillett had threatened Milam with a firearm; he had "stuff" on him now; and Milam had dropped Gillett off at 606 North Ash Street, where he was staying while in Russell.

¶40. Furthermore, while this Court has held that probable cause does not exist for the issuance of a search warrant when the search warrant contains no corroboration or indicia of veracity or reliability of the informant (*State v. Woods*, 866 So. 2d 422, 427 (Miss. 2003)), Lyon's affidavit in support of the search warrant includes information corroborating Milam's statements. For example, Milam's statement that Gillett was in possession of a stolen white pickup truck was corroborated by neighbors of the Gillett farm who said they had seen the truck; Milam's statements regarding Gillett manufacturing methamphetamine were corroborated by her leading officers to the trash bag Gillett had discarded, which indeed contained items used in the manufacture of methamphetamine (referred to by officers as a "methamphetamine laboratory"); Milam's statements regarding the manufacture of

25

methamphetamine were further corroborated when she allowed officers to search her vehicle and find a propane tank in her trunk, reportedly left there by Gillett; and Milam's statement that Gillett had committed computer crimes in Oregon was corroborated when Agent Lyon discovered that there was an active felony warrant for Gillett's arrest for computer crimes committed in Oregon.

¶41. Therefore, there was a substantial basis for the magistrate judge to issue the warrant and for the trial court to conclude that probable cause existed. Accordingly, we find that the trial court did not err in denying Gillett's motion to suppress the seizures from the warranted search of 606 North Ash Street.[12]

**IV. Whether the trial court erred in denying Gillett's motion to suppress evidence of the warranted search of 5482 190th Street.**

¶42. Gillett's next assignment of error is that the trial court erred in denying his motion to suppress seizures from the warranted search of the Gillett farm, located at 5482 190th Street, Russell County, Kansas. On March 29, 2004, Agent Lyon secured a search warrant for the Gillett farm. Lyon supported the warrant with an affidavit containing the same information contained in the affidavit he had prepared to support the warrant for the search of 606 North Ash Street, the content of which is included in the discussion of the previous issue above. We find that, based on the information included in the affidavit in support of the warrant for

---

[12] One of the State's arguments regarding this issue is that Gillett never showed a legitimate expectation of privacy in the residence at 606 North Ash Street, owned by his aunt, and therefore Gillett failed to establish standing to challenge the warranted search of 606 North Ash Street. Given the discussion above regarding the propriety of the search warrant and the search, this argument is not relevant and need not be addressed.

the search of the Gillett farm, there was a substantial basis for the magistrate judge to issue the warrant and for the trial court to conclude that probable cause existed.

¶43. In addition to arguing that there was no probable cause to issue the search warrant for the Gillett farm, Gillett argues that the search warrant for the farm is invalid for failure to describe with particularity the place to be searched, and that the search conducted was beyond the scope of the warrant. Gillett's primary argument is that the only structure on the farm that lawfully could have been searched was "a shed" into which Milam told Lyon she saw Gillett drive a white pickup truck and to which Lyon referred in his affidavit.

¶44. The search warrant for the farm authorized the officers to search:

> A farm house located in the northeast corner of section 33, Township 11 South, Range 13 West, Russell County, Ks, commonly known as 5482-190th St., to include any out buildings normally associated with this residence.
>
> The search is to include the persons of anyone on the property at the time of the search and any vehicles or conveyances located on the property at the time of the search.

This description of the places to be searched "particularly describ[es] the place to be searched and the persons or things to be seized," as a search warrant is required to do. *Maryland v. Garrison*, 480 U.S. 79, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987). At trial, through use of testimony and exhibits, the farm was described as a cluster of buildings, situated fairly close together, consisting of a metal shed, a wooden shed, an abandoned farmhouse, and an outhouse (or old chicken house). A search of any or all of these buildings was within the scope of the warrant, which authorized search of "a farm house" and "any out buildings normally associated with this residence." Further, regarding the propriety of the scope of the

27

warrant, Milam did not indicate that Roger's activities at the farm involving methamphetamine had taken place only in a single shed. In sum, the search warrant for the Gillett farm was based on probable cause, was sufficiently particular regarding the place to be searched, and was properly executed. Therefore, the trial court did not err in denying Gillett's motion to suppress evidence obtained during the warranted search of the farm.

**V. Whether the trial court erred in denying Gillett's motion for directed verdict as to Count II of the indictment, charging Gillett with the capital murder of Vernon Hulett.**

¶45.    Gillett's fifth assignment of error is that Count II of the indictment, charging Gillett with the capital murder of Vernon Hulett, should not have proceeded to the jury because it is undisputed that the white pickup truck, which the State theorizes Gillett stole, was owned solely by Linda Heintzelman. Gillett contends that, in order for him to be guilty of capital murder under Mississippi Code Section 97-3-19(2)(e), Vernon Hulett must have had an interest in the white pickup truck that allegedly was stolen.

¶46.    Mississippi Code Section 97-3-19(2)(e) states that:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
> . . .
> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual assault . . . or in any attempt to commit such felonies[.]

Miss. Code Ann. 97-3-19(2)(e) (Rev. 2006). The statute simply states that, to constitute capital murder, the killing of a human being must be committed while "engaged in the commission of the crime of . . . robbery . . . ." It does not state that the person killed must have had an interest in the property taken. *See BellSouth Telecomms., Inc. v. Miss. Pub.*

***Serv. Comm'n***, 2009 WL 2393808, *4 (Miss. Aug. 6, 2009) ("When the language used by the Legislature is plain and unambiguous and the statute conveys a clear and definite meaning, as here, the Court will have no occasion to resort to the rules of statutory interpretation."). As support for this proposition that the person killed need not have had an interest in the property taken, the State cites ***Grant v. State***, 8 So. 3d 213, 216 (Miss. Ct. App. 2008), *cert. denied*, 12 So. 3d 531 (Miss. 2009), which held that the killing of a coconspirator during a robbery constituted capital murder under Section 97-3-19(2)(e). The State logically argues that, if a coconspirator, who obviously does not have a valid interest in the property he was stealing, is covered by the statute, so must be an innocent victim.[13] Therefore, we find that the trial court did not err in denying Gillett's motion for directed verdict on Count II of the indictment, and further, that all arguments Gillett makes regarding this claim are without merit.[14]

---

[13] The primary case Gillett cites as support for the proposition that Count II should not have proceeded to the jury, ***Thomas v. State***, 278 So. 2d 469, 472 (Miss. 1973), does not in fact support that proposition. Rather, ***Thomas*** merely states that specific intent to steal is an essential element of the crime of robbery. ***Id.***

[14] The further arguments Gillett makes regarding this claim are:

Claim 5(A)
Therefore, it was reversible error to overrule Mr. Gillett's motion for a directed verdict on Count Two and jury instruction D-72, the peremptory instruction on Count Two, and Mr. Gillett's motion for judgment notwithstanding the verdict[.]

Claim 5(B)
Because Count Two should not have gone to Mr. Gillett's jury, the verdict of guilty as charged on Count Two is legally insufficient and cannot stand[.]

Claim 5(C)

**VI. Whether the trial court erred in allowing jury instructions S-5 and S-6.**

¶47.    Gillett's next assignment of error is that the trial court erred in allowing jury instructions S-5 and S-6 because they do not require the jury to conclude that the intent to rob the victims was formed sometime before the victims died.   "This Court has repeatedly held that, 'jury instructions are within the sound discretion of the trial court.'" ***Rubenstein v. State***, 941 So. 2d 745, 787 (citing ***Goodin v. State***, 787 So. 2d 639, 657 (Miss. 2001)).

¶48.    S-5 states:

> The Court instructs the Jury that in a case of Capital Murder the fact that the victim was dead at the time of taking her personal property does not mitigate against the conclusion of the robbery.  If the intervening time between the murder, if any, and the time of the taking of the property, if any, formed a continuous chain of events, the fact that the victim was dead when the property was taken cannot absolve the Defendant from the crime.

> If you should find from the evidence in this case beyond a reasonable doubt that Roger Lee Gillett, alone or in conjunction with another, killed and murdered Linda Heintzelman and then, after the said Linda Heintzelman was dead, took the personal property of Linda Heintzelman; and if you should further find beyond a reasonable doubt that the intervening time between the time of the murder, if any, and the time of the taking of the property, if any, formed a continuous chain of events, the fact that Linda Heintzelman was dead when the property was taken does not absolve the Defendant from the crime of capital murder in Count I.

---

Because Mr. Gillett's conviction as charged under Count Two is legally insufficient, the death sentence for this conviction must be vacated[.]

Claim 6
Entirely because Count Two was legally insufficient for reasons stated in claim 5, the death sentence for the conviction under Count One must also be vacated as it is premised on inadmissible evidence of bad character[.]

¶49. S-6, which is nearly identical to S-5, aside from the substitution of Vernon Hulett's name as the murder victim, states:

> The Court instructs the Jury that in a case of Capital Murder the fact that the victim was dead at the time of taking the personal property of Linda Heintzelman does not mitigate against the conclusion of the robbery. If the intervening time between the murder, if any, and the time of the taking of the property, if any, formed a continuous chain of events, the fact that the victim was dead when the property was taken cannot absolve the Defendant from the crime.
>
> If you should find from the evidence in this case beyond a reasonable doubt that Roger Lee Gillett, alone or in conjunction with another, killed and murdered Vernon Hulett and then, after the said Vernon Hulett was dead, took the personal property of Linda Heintzelman; and if you should further find beyond a reasonable doubt that the intervening time between the time of the murder, if any, and the time of the taking of the property, if any, formed a continuous chain of events, the fact that Vernon Hulett was dead when the property was taken does not absolve the Defendant from the crime of capital murder in Count II.

¶50. First, as pointed out by the State numerous times at trial and in its brief to this Court, Mississippi follows the "one-continuous-transaction" rationale in capital cases. In other words, "where the two crimes [e.g., murder and robbery] are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." *Pickle v. State*, 345 So. 2d 623, 627. "An indictment charging a killing occurring 'while engaged in the commission of' one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." *Turner v. State*, 732 So. 2d 937, 950 (Miss. 1999) (quoting *West v. State*, 553 So. 2d 8, 13 (Miss. 1989)).

31

¶51.  Moreover, this Court specifically has found that the intent to rob, which is required to

prove the underlying felony of robbery, can be shown from the facts surrounding the crime.

*Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005); *Lynch v. State*, 877 So. 2d 1254, 1266

(Miss. 2004)).  The *Walker v. State* Court explained the following:

> In *Knox v. State*, 805 So. 2d 527 (Miss. 2002), Knox contended that the State
> presented insufficient evidence to prove that he intended to rob the victim when
> he killed her.  Because of the alleged insufficiency of evidence, Knox argued
> that the State failed to prove the underlying felony of robbery, and, therefore,
> the charge of capital murder.  *Id.* at 531.  This Court disagreed with Knox's
> claims holding: "'Intent to do an act or commit a crime is also a question of fact
> to be gleaned by the jury from the facts shown in each case.'" *Id.* (quoting
> *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974)).  This Court found it most
> significant that Knox was in possession of the victim's personal belongings at
> the time he was arrested.  *Id.* at 532.  This Court held: "[W]hen the defendant
> is discovered with the personal property of the deceased on his person, it is
> entirely within reason for the jury to find that this fact in itself constitutes
> robbery." *Id.*

*Walker*, 913 So. 2d at 224.  Thus, it was not error for the trial court to leave to the jury the

question of whether, based on the facts surrounding the crime, Gillett had the intent to rob

Linda Heintzelman.  Not only was evidence revealed at trial that Gillett was in possession of

the stolen truck, but a witness testified that Gillett had confessed to him that "he had taken the

pickup and the owners [whom he had 'taken care of'] were in the back of it."

¶52.  Lastly, the primary authority on which Gillett relies to support the proposition that the

State must prove that Gillett had intent to rob Heintzelman prior to killing her – *Pickle v.*

*State*, 345 So. 2d 623, 626 (Miss. 1977) – does not stand for that proposition.  Rather, as

stated above, *Pickle* stands for the proposition that the crime of capital murder exists where

32

"the two crimes are connected in a chain of events and occur as part of the res gestae."[15] *Id.* at 627.

¶53.    Therefore, the trial court did not abuse its discretion in allowing the jury to consider instructions S-5 and S-6.

¶54.    Gillett also argues that instruction S-6 was improper because Vernon Hulett had no property interest in the white pickup truck. Based on the analysis provided under the previous section heading (section "V"), we find that argument to be without merit.

**VII. Whether the trial court erred in permitting expert testimony regarding DNA results over Gillett's *Daubert* objection.**

¶55.    Gillett's next assignment of error is that the trial court erred in permitting the expert testimony of William Jones, DNA Section Chief at the Mississippi Crime Laboratory, regarding DNA results, over Gillett's *Daubert* objection. A pretrial *Daubert* hearing was held on September 20, 2007, regarding the reliability of DNA evidence the State wished to introduce, which showed that a shoe recovered from the landfill in Russell, Kansas, had the blood of Linda Heintzelman on it. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

¶56.    At the hearing, the primary point of contention was that the blood samples taken from the deceased bodies of Linda Heintzelman and Vernon Hulett during their autopsies had been

---

[15] The discussion in *Pickle* contains a block quote from *American Jurisprudence*, which includes the statement: "The felony-murder doctrine does not apply, however, when the determination to steal property of the victim is not formed until after the homicide." *Pickle*, 345 So. 2d at 626 (quoting 40 Am. Jur. 2d *Homicide* § 73 at 366-67 (1968)). The *Pickle* court, however, did not state it was adopting what the *American Jurisprudence* quote stated. *Id.*

stored in "red-top" tubes, as opposed to "purple-top" tubes – purple-top tubes being the preferred type, if available. Purple-top tubes are preferable because they contain a preservative that prevents the blood from clotting or otherwise deteriorating. Red-top tubes contain no preservative.

¶57.    Jones – who has been a forensic scientist since 1989 – testified that it is the Mississippi Crime Laboratory's practice to use the red-top tubes for DNA if no purple-top tubes are available.[16] Jones testified that customary procedures and controls were used in his testing of the samples at issue, and that nothing had occurred in the analytical process that caused him any concern regarding the controls. He testified that the Crime Laboratory's protocol does not exclude red-top tubes from being used, and that other DNA analysts also use red-top tubes. Jones was satisfied with the test results and confident that there was no error. He testified that there is no way that using a red-top tube would have resulted in a misidentification; he is "absolutely convinced that if you get a DNA profile from red-top tube,

---

[16] Jones initially had requested purple-top tubes for testing, indicating in a report that "purple-top tubes are needed," because, at the time that he authored the report, he did not know that Linda Heintzelman and Vernon Hulett were dead and that purple-top tubes thus could not be provided. At the ***Daubert*** hearing, Jones clarified that, when he wrote "purple-top tubes are needed," he meant, they are needed, *if available*.

Dr. Donald Pojman, the pathologist who performed the autopsies of Linda Heintzelman and Vernon Hulett and collected the blood samples from them, explained why he put the blood samples in red-top tubes:

Generally, when we're doing DNA testing or other type [*sic*] of blood banking work, they want the tubes in a purple-top tube which has the preservative EDTA in it.

Well, after death that changes because all the blood is going to be clotted anyway. So our red tops, our purple tops, and our green tops are the exact same tubes. . . .

34

that it would be the same as from the purple-top tube of that individual." In other words, results from a red-top tube sample either would provide a valid identification or no identification at all, but not a misidentification.

¶58.    Gillett's DNA expert, Dr. Peter D'Eustachio, testified that test results reached by Jones are unreliable because Jones used red-top tubes. D'Eustachio testified that the red-top-tube samples that were tested in this case behaved in an unexpected way. He criticized the Crime Laboratory for not having validated the procedure for testing red-top tubes. He testified that no validation studies had been conducted regarding red-top tubes. D'Eustachio conceded that he did not know of any studies that address red-top-tube testing.

¶59.    At the conclusion of the hearing, the trial court ruled that the DNA evidence would be admissible at trial, and that the jury would be left to attach the amount of weight to the evidence they deemed warranted, explaining:

> While the red-top tubes may not be the preferred way for substances to be submitted for DNA evaluation, for the purposes of this hearing and the matters before this Court today, I think that the **_Daubert_** gatekeeping role of this Court is to play, I think the State's witness certainly satisfies those criteria, and your motion will be denied and this evidence will be allowed. Of course, the remainder of that question is left to the providence of the jury.

¶60.    Gillett now argues that the trial court erred in this ruling because the State failed to demonstrate the scientific reliability of the methodology used by the State's expert to achieve the results reported in the Mississippi Crime Laboratory report, which found that the blood on the shoe from the Russell, Kansas, landfill matched Linda Heintzelman's blood (but not Vernon Hulett's blood).

¶61.    A trial court's admission or exclusion of expert testimony is reviewed for abuse of discretion. ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31 (Miss. 2003).   The trial court's decision will stand unless the reviewing court concludes that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion. ***Id.***

¶62.    In ***McLemore***, this Court adopted the "***Daubert/Kumho***" rule – in other words, the U.S. Supreme Court's standard set forth in ***Daubert***, 509 U.S. 579, and ***Kumho Tire Co., Ltd. v. Carmichael***, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) – as the standard for assessing the reliability and admissibility of expert testimony. ***McLemore***, 863 So. 2d at 35. Of primary importance in assessing the admissibility of expert testimony is Rule 702 of the Mississippi Rules of Evidence, which is identical to Rule 702 of the Federal Rules of Evidence.   It states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702.

¶63.    Summarizing ***Daubert*** and ***Kumho***, the ***McLemore*** Court explained the following: "[T]he liberal goals of the [rules] include reducing the traditional barriers to opinion testimony." ***McLemore***, 863 So. 2d at 36 (citing ***Daubert***, 509 U.S. at 588-89). *See also **Poole v. Avara**, 908 So. 2d 716, 722 (Miss. 2005) ("The [U.S. Supreme] Court emphasized the liberal thrust of the rules and the general approach of the rules to relax the traditional

barriers to opinion testimony."). Trial courts, however, retain authority to review scientific evidence to determine admissibility and are vested with a "gatekeeping responsibility." *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 589). The trial court must engage in a two-pronged inquiry, determining whether the expert testimony rests on a reliable foundation and is relevant to the matter. *Id.* Regarding the "reliability" prong – the prong at issue in the instant case – the testimony must be grounded in the methods and procedures of science, not merely a subjective belief or unsupported speculation. *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 590). As Rule 702 states, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods." Miss. R. Evid. 702.

¶64. The *Daubert* Court adopted a nonexhaustive, illustrative list of reliability factors for determining the admissibility of expert testimony. *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 592-94). The factors include: whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *McLemore*, 863 So. 2d at 37 (citing *Daubert*, 509 U.S. at 592-94). The applicability of these factors varies depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony. *McLemore*, 863 So. 2d at 37 (citing *Kumho Tire*, 526 U.S. at 151). The analysis of expert testimony's admissibility is a flexible one that must focus on the principles and methodology

37

applied, not on the conclusions they generate. *McLemore*, 863 So. 2d at 37; *Daubert*, 509 U.S. at 595.

¶65. The *McLemore* Court emphasized that "the trial court's role as gatekeeper is not intended as a replacement for the adversary system." *McLemore* 863 So. 2d at 39. "'Vigorous cross-examination, presentations of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *McLemore*, 863 So. 2d at 36 (quoting *Daubert*, 509 U.S. at 595-96). If the trial court concludes that the evidence supporting a position is insufficient to allow a reasonable juror to conclude that the position is more likely than not true, the trial court can direct a judgement or grant summary judgment. *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 596). These traditional devices, rather than the wholesale exclusion of the testimony, are the appropriate safeguards where the testimony meets the standards of Rule 702. *McLemore*, 863 So. 2d at 37; *Daubert*, 509 U.S. at 596. "Absent other grounds to exclude, an expert's testimony is presumptively admissible when relevant and reliable." *McLemore*, 863 So. 2d at 39.

¶66. Based on review of the testimony of the parties' expert witnesses at the *Daubert* hearing, we find that it was not an abuse of discretion for the trial court to find that Jones' testimony was based on sufficient data and was the product of reliable methods. Therefore, the trial court did not abuse its discretion in allowing Jones to testify at trial regarding the DNA evidence. As noted above, cross-examination and presentation of contrary evidence

were the appropriate means of attacking any aspects of Jones' testimony; however, the defense chose neither to cross-examine Jones nor to object to his testimony at trial.

**VIII. Whether the trial court erred in denying Gillett's requested culpability-phase instructions: D-42, -44, -45, -53, -60, -19, -25, -41, and -20.**

¶67. Gillett's next assignment of error is that the trial court erroneously excluded several of his culpability-phase jury instructions. As noted in section VI, "[t]his Court has repeatedly held that, 'jury instructions are within the sound discretion of the trial court.'" *Rubenstein v. State*, 941 So. 2d 745, 787 (citing *Goodin v. State*, 787 So. 2d 639, 657 (Miss. 2001)). In addition, as stated in *Walker v. State,* 913 So. 2d 198 (Miss. 2005):

> This Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole. *Thomas v. State*, 818 So. 2d 335, 349 (Miss. 2002). A defendant is entitled to have jury instructions which present his theory of the case. *Id.* This entitlement is limited, however, in that the court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Id.*

*Walker*, 913 So. 2d at 324 (quoting *Parks v. State*, 884 So. 2d 738, 746 (Miss. 2004).

¶68. Gillett claims that instructions D-42, -44, and -45, individually and collectively, were erroneously excluded. These instructions read:

D-42:

> It is a defense theory that the prosecution's investigation evidence in this case was negligent, incomplete, purposefully distorted and/or not done in good faith. You are to assess the credibility of the investigative evidence together with all of the other evidence.

> Investigation which is thorough and conducted in good faith may be credible while an investigation which is incomplete, negligent or in bad faith may be found to have lesser value or no value at all.

39

In deciding the credibility of the witness and the weight, if any, to give the prosecution evidence, consider whether the investigation was negligent and/or conducted in bad faith.

D-44:

If you find that the State inadequately investigated one matter, you may infer that the prosecution also inadequately investigated other matters. Based on this inference alone you may disbelieve the prosecution witnesses and evidence. This, by itself, may be sufficient for you to have a reasonable doubt as to the defendant's guilt.

D-45:

As the State has lost evidence, there is a rebuttable presumption that the information contained in that evidence would have been favorable to the defendant.

¶69. As support for Gillett's claim that the prosecution's investigation was negligent, incomplete, purposefully distorted, and/or not done in good faith, he states the following:

> Debbie Milam, Kathy Thacker and Jimmy Ploutz drove to the farmstead during the pre-dawn hours of March 29, 2004.
>
> None of these individuals initially told police that they went to the farmstead during the pre-dawn hours of March 29, 2004.
>
> These individuals all told police that they stored items taken from the farmstead on March 29, 2004, at the residence of Nona Kay Adams, 440 15th Street, Russell, Kansas.
>
> KBI Agent Butler photographed, catalogued and collected at least one cigarette butt, one chewed plastic straw and one cigarette lighter that KBI Agent Butler explained were beneath the freezer (cigarette butt), behind the freezer (chewed plastic straw) and "right in front of the freezer where the bodies were found" and "looked as if it were new to the scene" (blue cigarette lighter). None of these items were ever analyzed for biological

40

or fingerprint information even though police had Mr. Gillett's fingerprints, blood, oral swabs and body hair.

KBI Agent Butler photographed and seized a cardboard scabbard for a handsaw. This scabbard was found in the same wooden shed where the human remains were found. Dr. Pojman created cut margins on the injuries to each side of Mr. Hulett's dismembering injuries. Agent Butler and Dr. Pojman testified that tool markings can be compared to cut margins to identify a cutting instrument. No cut-margin analysis was ever performed on the handsaw identified as "Distan, 26 inch, hard point saw, crosscut, eight points per inch."

On April 2, 2004, four days after the discovery of the human remains and the arrest of Mr. Gillett, police enter 440 15th Street, Russell, Kansas, with a search warrant. Police photograph a hammer at the location where Debbie Milam, Kathy Thacker and Jimmy Ploutz all tell police they stashed items taken from the farmstead on March 29, 2004. Police never take this hammer into evidence for processing or for comparison to pattern injuries on a decedent, notwithstanding the findings of Dr. Pojman that Mr. Hulett died as a result of blunt-force trauma caused by a hammer-like instrument.

Police secured biological information from Mr. Gillett permitting forensic comparisons with each and every item inventoried above. Conversely, police never even sought biological information from Debbie Milam or Kathy Thacker or Jimmy Ploutz – even after police testified that [they] were made aware that these individuals covered up their presence at the farmstead by lying to police and by hiding evidence.

Hattiesburg police lost the videotape of their initial entry into the home at 908 South Gulfport Street, Hattiesburg. Officer Byrd refers to this tape as the tape "of the crime scene at 908 South Gulfport St."

¶70.    While there certainly were items that the State chose not to collect and/or not to test,

Gillett has not shown that law enforcement was negligent in its investigation, that it distorted

41

any evidence, or that it in any way acted in bad faith. Furthermore, while it is true that the videotape of the initial entry into the home at 908 South Gulfport Street was misplaced due to the moving of the crime-scene unit office, law enforcement officers took still photographs of their investigation in the home, and those photographs were entered into evidence. Therefore, no evidence was produced at trial to support instruction D-42, and the trial court rightfully denied it.

¶71. As to instruction D-44, the cases Gillett offers to support this instruction – *United States v. Shyllon*, 10 F. 3d 1, 3 (D.C. Cir. 1993), *People v. Wimberly*, 7 Cal. Rptr. 2d 152, 163-64 (Cal. Ct. App. 1992), and *Commonwealth v. Bowden*, 399 N.E. 2d 482, 491 (Mass. 1980) – are not binding precedent, and moreover do not actually support the proposition raised by the instruction. Furthermore, as just noted, there is no evidence that the State inadequately investigated the matter.

¶72. As to instruction D-45, since there is no evidence to suggest that the video of the search of 908 South Gulfport Street would have revealed anything significantly different from the still photos taken at the residence (which were submitted as exhibits), there is insufficient evidence to support an instruction that instructs the jury to presume that the information contained in the lost evidence would have been favorable to the defendant.

¶73. Therefore, the trial court did not abuse its discretion in excluding D-42, D-44, and D-45.

¶74.    Gillett next argues that the trial court erred in excluding jury instructions D-53 and D-60, Gillett's proposed lesser-included or manslaughter instructions.  D-53 – which regarded Linda Heintzelman and is substantively identical to D-60 regarding Vernon Hulett – stated:

> If you acquit Roger Gillett of the capital murder of Linda Heintzelman and the murder of Linda Heintzelman you may then consider whether Roger Gillett is guilty of the manslaughter of Linda Heintzelman.
>
> If you find from the evidence unanimously and beyond a reasonable doubt, that Roger Gillett, on or about March 20, 2004, in Forrest County, purposely or knowingly caused serious bodily injury to Linda Heintzelman through the use of a deadly weapon or other means likely to produce death or serious bodily harm but without deliberate design to effect the death of Linda Heintzelman and, further, that Roger Gillett was not acting in self defense, was not acting in defense of another, did not act with lawful authority, had the mental capacity to know right from wrong at the time, and the assault upon Linda Heintzelman was not accidental, and that, as a result of the assault, Linda Heintzelman died, then you shall find Roger Gillett guilty of manslaughter.
>
> If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find Roger Gillett not guilty of manslaughter.

¶75.    This Court has held that a manslaughter or lesser-included-offense instruction should be given only "if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense . . . ." *Underwood v. State*, 708 So. 2d 18, 36-37 (Miss. 1998) (citing *Welch v. State*, 566 So. 2d 680, 684 (Miss. 1990)).  *See also* *Bellinger v. State*, 667 So. 2d 1242, 1255 (Miss. 1995).  There is no evidence in the record to support the theory that Linda Heintzelman and Vernon Hulett were killed "without deliberate design to effect [their] death[s]" (Instruction D-53 and 60); Gillett never offered an alternative evidentiary scenario to show that the killings were

43

consistent with his version of manslaughter included in the instruction above. Therefore, we find that there is no evidence in the record to support jury instructions D-53 and D-60.

¶76. Gillett next argues that the trial court erred in excluding jury instruction D-19, which regarded reasonable doubt. D-19 stated:

> I shall not define "reasonable doubt" for you. Each of you is free to determine what you believe to be a "reasonable doubt." Therefore, it is not necessary that a reasonable doubt be a collective doubt shared by all or a majority of the jurors. If a reasonable doubt is present in the mind of only a single juror, then the juror must vote to acquit.

Gillett argues that this instruction was necessary to emphasize that each juror must be convinced of guilt beyond a reasonable doubt.

¶77. As noted above, the trial court is allowed to refuse instructions fairly covered elsewhere in the instructions, and the trial court gave instruction C-2 regarding probable cause, which stated:

> This Court instructs the jury that you are bound in deliberating upon this case, to give the defendant the benefit of any reasonable doubt of the defendant's guilt that arises out of the evidence or want of evidence in this case. There is always a reasonable doubt of the defendant's guilt when the evidence simply makes it probable that the defendant is guilty. Mere probability of guilt will never warrant you to convict the defendant. It is only when, after examining the evidence on the whole, you are able to say on your oaths, beyond a reasonable doubt, that the defendant is guilty that the law will permit you to find him guilty. You might be able to say that you believe her [*sic*] to be guilty and yet, if you are not able to say on your oaths, beyond a reasonable doubt, that he is guilty, it is your sworn duty to find the defendant "Not Guilty."

The substance of instruction D-19 was adequately covered in instruction C-2, and therefore the trial court did not abuse its discretion in denying instruction D-19.

¶78. Gillett next contends that the trial court erred in excluding jury instruction D-25, which

regarded impeachment of a witness. D-25 stated:

> The testimony of a witness or witnesses may be discredited or impeached by showing that on a prior occasion they made a statement which is now inconsistent or contradictory to their testimony in this case. In order to have this effect, the inconsistent or contradictory prior statement must involve a matter which is material to the issues in this case.
>
> You may consider any earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness. If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves, if any.

The only binding precedent Gillett submitted along with this instruction was *Ellis v. State*,

790 So. 2d 813, 814-16 (Miss. 2001), *overruled on other grounds by Williams v. State*, 32 So.

3d 486 (Miss. 2010).

¶79. When Gillett submitted this instruction at trial, the following statements were made:

THE COURT: 25?

MR. LAPPAN [Defense counsel]: Submitted.

MR. SAUCIER: Objection, Your Honor. The authority given was *Ellis v. State*. The second paragraph is not in that jury instruction in *Ellis v. State*. And another thing that this jury instruction doesn't do that *Ellis v. State* does is a prior statement must involve a material matter to the issues. This doesn't say that. The prior statement of the witness and what *Ellis* said was the prior statement of the witness or witnesses can be considered by you only for the purposes of determining the weight or believability that you give the testimony of the witness or the witnesses that made them. You may not consider the prior statement as proving the guilt or innocence of the defendant. This jury instruction doesn't contain any of that language.

THE COURT: Response?

45

MR. LAPPAN: No, sir.

THE COURT: It will be refused.

¶80.    When the trial court asked the defense to respond, it declined the opportunity to inform the court of the relevance or propriety of the instruction as a whole, and it did not take the opportunity to point to authority that might support the second paragraph of the instruction. This Court has held that a trial court is not required to draft or give every instruction allowable in a capital case; it is the duty of the defendant to submit instructions that he wishes to be given. *Jordan v. State*, 786 So. 2d 987, 1025 (Miss. 2001). Therefore, even if part of the instruction was proper and supported by authority, the trial court was not required to modify the instruction to resolve the State's objection, nor to give the instruction at all if it found it improper.

¶81.    In addition, there is no evidence in the record to support an impeachment instruction; the instruction would not apply to any of the witnesses who testified. Gillett argues that the instruction pertained to Debbie Milam. There is no evidence, however, that Milam made any statements prior to trial that were inconsistent with her trial testimony. Milam merely did not reveal to officers that she had returned to the Gillett farm in the predawn hours of March 29, 2004, until interviews that occurred subsequent to her initial March 29, 2004, interview, and Milam readily admitted at trial that she did not initially reveal that information to officers.

¶82.    Therefore, the trial court did not abuse its discretion in excluding instruction D-25.

46

¶83.   Gillett next argues that the trial court erred in refusing instruction D-41, which regarded a witness persistently volunteering statements prejudicial to a defendant.   D-41 stated:

> A witness who persistently volunteers statements prejudicial to a defendant when such responses are not called for by the questions which are asked is behaving in a manner offensive to the fair administration of justice. You may consider this tendency of the witness in evaluating his possible bias, and hence in deciding the credibility of that witness.

¶84.   Gillett argues that this instruction was appropriate, in light of an alleged discrepancy in the testimony of Agent Lyon and Agent Moore regarding why they chose not to go forward with an undercover operation to expose Gillett.  Gillett offers a portion of Lyon's testimony, which explained that the agents did not go forward with the undercover investigation because it was deemed too dangerous for the undercover agent, Moore.  Gillett then offers a portion of Moore's testimony, which explained that part of the reason they did not go through with the undercover operation was that Moore had never worked undercover with Milam (Gillett's aunt, who served as an informant) before and had some concerns about her credibility.

¶85.   First, the cited testimony of these two agents is not inconsistent.  Second, in a different portion of Moore's testimony, she specifically testified that the undercover operation was not executed because it was determined to be too dangerous.  Furthermore, Gillett did not raise this alleged discrepancy at trial as the reason for offering instruction D-41.  At trial, the following was stated:

THE COURT: 41?

MR. LAPPAN [Defense Attorney]: Submitted.

MR. SAUCIER: Object because it goes toward the weight and credibility of witnesses and he shouldn't give those.

THE COURT: Do you have authority for that statement?

MR. SAUCIER: No, sir, I don't have any authority. I haven't even seen that instruction before.

THE COURT: I haven't either.

MR. LAPPAN: Judge, the reason why I submitted D-41, if it please the Court, is Agent Lyon, if you recall, when he was testifying under examination from myself volunteered information that Roger had a gun at a high school and I objected to a narrative response, and I believe he was volunteering information that was prejudicial to Roger, and that's why I submitted D-41.

THE COURT: I'm going to refuse it.

¶86. On appeal, Gillett does not argue that instruction D-41 was appropriate because of Lyon's statement about Gillett once bringing a gun to high school. However, even if he were making that argument, the instruction still would not be appropriate because there is no evidence in the record that Lyon "*persistently* volunteer[ed] statements prejudicial to [the] defendant . . . ." Instruction D-41 (emphasis added).

¶87. Lastly, the only authority Gillett cites as support for instruction D-41 – ***United States v. Andrea***, 538 F. 2d 1255, 1256-57 (6th Cir. 1976) – is not binding precedent, and moreover, does not support giving the instruction. In ***Andrea***, the Sixth Circuit noted the "apparently deliberate injection into the record by Federal Bureau of Investigation witnesses of facts which could have conveyed to the jury information pertaining to defendant's incarceration on a different charge." ***Andrea***, 538 F. 2d at 1256. Even so, the Sixth Circuit found the injection

of these facts into the record to be harmless error, given all the circumstances in the case. ***Id.*** at 1256-57. Moreover, the statement Lyon made about Gillett bringing a gun to school was not analogous to the statements the FBI witnesses made in ***Andrea***; Lyon's single mention of gun possession was not similarly deliberate. In addition, the only objection Gillett made at trial to Lyon's statement about Gillett possessing a gun in high school was that it was a "narrative response."

¶88. Therefore, the trial court did not abuse its discretion in excluding instruction D-41.

¶89. Gillett next argues that the trial court erred in denying instruction D-20, regarding guilt by association. D-20 reads: "Guilt by association is neither a recognized nor tolerable concept in criminal law."

¶90. This instruction was fairly covered elsewhere in the jury instructions, specifically by S-7, D-8, and D-21.

S-7 stated in relevant part:

Before any Defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about a crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a Defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the Defendant was a participant and not merely a knowing spectator.

D-8 stated:

You are here to decide whether the prosecution has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the

49

indictment. Neither are you to be concerned with the guilt of any other person not on trial as a defendant in this case.

D-21 stated:

> Roger Gillett cannot be convicted upon mere suspicion. No amount of suspicion or innuendo, however strong, will warrant his conviction.

Because S-7, D-8, and D-21 were given, the trial court, considering the jury instructions as a whole, did not abuse its discretion in denying D-20.

## IX. Whether the State satisfactorily established venue.

¶91.    Gillett's next assignment of error is that the State failed to establish venue. This issue is raised for the first time on appeal; however, this Court has held that "venue is jurisdictional and must be proven, and that the question could be raised for the first time in this court." *Crum v. State*, 63 So.2d 242, 244-45 (Miss. 1953) (internal quotations omitted).

¶92.    In *Hill v. State*, 797 So. 2d 914 (Miss. 2001), this Court explained:

> Proof of venue is an essential part of criminal prosecution, and the State bears the burden of proving venue beyond a reasonable doubt. Venue may be proved by either direct or circumstantial evidence. . . .
> While the ultimate burden of proving venue that rests upon the State is beyond a reasonable doubt, this is a standard of proof before the jury, not the trial judge. . . .
> As long as the evidence is sufficient to lead a reasonable trier of fact to conclude that the crime in the present case occurred at least partly in Forrest County [the county where *Hill v. State* and the instant case were tried], then the evidence of venue is sufficient. . . .

*Hill v. State*, 797 So. 2d 914, 916 (Miss. 2001) (internal citations omitted).

¶93.    The statutes relevant to this question of venue are Mississippi Code Sections 99-11-19 and 99-11-3(1). Section 99-11-19 provides:

50

When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.

Miss. Code Ann. § 99-11-19 (Rev. 2007).

¶94.   Section 99-11-3(1) provides:

The local jurisdiction of all offenses, unless otherwise provided by law, shall be in the county where committed.  But, if on the trial the evidence makes it doubtful in which of several counties, including that in which the indictment or affidavit alleges the offense was committed, such doubt shall not avail to procure the acquittal of the defendant.

Miss. Code Ann. § 99-11-3(1) (Rev. 2007).

¶95.   In the instant case, sufficient evidence was presented to lead the jury to conclude beyond a reasonable doubt that the crimes took place, at least in part, in Forrest County, where the case was tried.  The State points out the following facts, which were brought forth through trial testimony.  Gillett was staying at the home of the victims, Vernon Hulett and Linda Heintzelman.  The home was located at 908 South Gulfport Street, Hattiesburg, Forrest County, Mississippi.  According to those who testified, the victims were last seen on March 19, 2004.  On March 20, 2004, Gillett told Michael Hester, Vernon Hulett's nephew who visited Vernon's house daily, that the victims had gone to the Coast with a friend.  According to testimony, Gillett was next seen in Kansas, where he confessed to friends that he had taken the white pickup truck he was driving from its owners, that he had killed the owners, and that their bodies were in the back of the truck.  The victims' bodies were found in a freezer at the Gillett farm.  The freezer was the property of the victims and was last seen (before it was

51

discovered at the farm) at the victims' residence at 908 South Gulfport Street. The bodies displayed were marked with signs of trauma, including cuts and stabs. Vernon Hulett's body was dismembered. The victims' possessions were discovered in trash bags at a Russell, Kansas, landfill where Gillett had been seen dropping off trash. In one of the trash bags, law enforcement officials found a shoe with blood on it. The shoe print of the shoe with blood on it matched a shoe print found at the victims' residence at 908 South Gulfport Street. The residence at 908 South Gulfport Street contained a rolled-up carpet with blood-like stains on it. And lastly, the residence at 908 South Gulfport Street showed numerous signs of blood-like stains throughout the house.

¶96. Presentation of these facts makes clear that sufficient evidence was presented to allow the jury to conclude beyond a reasonable doubt that the crimes had taken place, at least in part, in Forrest County. Therefore, the State satisfactorily established venue in Forrest County.

## X. Whether the trial court erred in overruling Gillett's objection to inadmissible source hearsay.

¶97. Gillett's next assignment of error is that the trial court erred in overruling his hearsay objection to testimony given by Terrell Carson, who was a detective sergeant with the Hattiesburg Police Department in March 2004. At trial, the following was stated during the direct examination of Terrell Carson:

> Q. [BY MR. WEATHERS]: Can you think back to March 29[, 2004] and tell the members of the jury whether or not you received a telephone call or communication from a law enforcement officer or agency from the State of Kansas in reference to an address in Hattiesburg?

A. [BY MR. CARSON]: I did. It was around 10:45 p.m., just before my shift was about to end, I received a call from my dispatch. She advised that I needed to call the Kansas Bureau of Investigation and speak with an Agent Mellor at which time I did call and speak with him and he gave me –

MR. FARRIS: Objection, Your Honor. It calls for hearsay.

MR. WEATHERS: Your Honor, it's not hearsay. It's strictly information provided to this gentleman to explain why he acted like he did.

MR. FARRIS: He's basing his testimony off what Agent Mellor told him.

MR. WEATHERS: Your Honor, I don't know how I could get him to explain why he did what he did unless he –

THE COURT: I'm going to allow him to testify to the information he received. Let's move along.

Q. [BY MR. WEATHERS]: Back to where we were, I think, Officer Carson, if you would, just tell us briefly, not in great detail, but who you got a call from and what he asked you to do.

A. [BY MR. CARSON]: I got a call from Special Agent Mellor. He asked me to go over to 908 South Gulfport Street for a welfare concern.

Q. [BY MR. WEATHERS]: All right. Did you do that?

A. [BY MR. CARSON]: Yes, I did.

¶98. Gillett argues that the testimony stating, "He asked me to go over to 908 South Gulfport Street for a welfare concern" is textbook hearsay and inadmissible. This Court, however, has held that such statements are admissible "to the extent required to show why an officer acted as he did and was at a particular place at a particular time." *Swindle v. State*, 502 So. 2d 652, 657-58 (Miss. 1987). "[A] statement is not hearsay if it is offered merely to show its effect on someone." *Thorson v. State*, 895 So. 2d 85, 126. (Miss. 2004). The

53

testimony at issue was not hearsay; it merely allowed Carson to explain why he went to the 908 South Gulfport Street residence. Therefore, the trial court did not err in overruling Gillett's objection to inadmissable source hearsay.

**XI. Whether Gillett's convictions are unsupported by the evidence and are against the overwhelming weight of the evidence.**

¶99. Gillett's next assignment of error is that his conviction and sentence are "contrary to established law and decidedly against the overwhelming weight of the evidence." He argues that "[t]he evidence was insufficient insofar as the State failed to meet its burden of proof by proving each element of the charged offense beyond a reasonable doubt." For these reasons, Gillett contends, the trial court erred in denying his motions for directed verdict, his peremptory instructions, and his post-trial motion, which was a Motion for a New Trial, and if Motion for New Trial is Denied, then a Motion for a New Sentencing Hearing. Gillett does not explain *why* the evidence was insufficient to support his conviction and sentence, nor why the conviction and sentence were against the overwhelming weight of the evidence.

¶100. When reviewing a claim that a conviction is against the weight of the evidence, this Court must accept the evidence that supports the verdict as true and will reverse a trial court's denial of a motion for new trial only when convinced that the trial court abused its discretion in denying the motion. *Valmain v. State*, 5 So. 3d 1079, 1086 (Miss. 2009). This Court will not order a new trial unless it finds that "the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction unconscionable injustice." *Id.* (quoting *Todd v. State*, 806 So. 2d 1086, 1090 (Miss. 2001)). There is a presumption that the

54

trial court's denial of a new trial is correct; the burden is on the appellant to demonstrate reversible error to this Court. ***Valmain***, 5 So. 3d at 1086. The evidence should be viewed in the light most favorable to the verdict, and "the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." ***Bush v. State***, 895 So. 3d 836, 844 (Miss. 2005) (citing ***Herring***, 691 So. 2d 948, 957 (Miss. 1997), *disagreed with on other grounds by* ***Dilworth v. State***, 909 So. 2d 731 (Miss. 2005) and quoting ***Amiker v. Drugs For Less, Inc.***, 796 So. 2d 942, 947 (Miss. 2000)).

¶101.  In analyzing the sufficiency of the evidence, this Court asks whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Moore v. State***, 966 So. 2d 756, 760 (Miss. 2008) (quoting ***Jones v. State***, 904 So. 2d 149, 153-54 (Miss. 2005) (citing ***Jackson v. Virginia***, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979))). This Court must accept as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom. ***Moore***, 996 So. 2d at 760. *See also* ***Derouen v. State***, 994 So. 2d 748, 751 (Miss. 2008) ("The evidence is viewed in the light most favorable to the State and all credible evidence supporting the conviction is taken as true."). If the Court finds that the evidence "is of such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." ***Bush v. State***, 895 So. 2d 836 (Miss, 2005) (quoting ***Edwards v. State***, 469 So. 2d 68, 70 (Miss. 1985)). *See also*

***Derouen***, 994 So. 2d at 751-52 ("Only where the evidence, as to at least one of the elements of the crime charged, is such that a reasonable fair minded jury could only find the accused not guilty, will this Court reverse." (quoting ***Eakes v. State,*** 665 So. 2d 852, 351 (Miss. 1995))).

¶102. The jury determines the weight and credibility to give witness testimony and other evidence. ***Massey v. State***, 992 So. 2d 1161, 1163 (Miss. 2008). This Court may not "pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief." ***Id.*** (quoting ***Davis v. State***, 568 So. 2d 277, 281 (Miss. 1990)).

¶103. Based on a review of the record in the light most favorable to the verdict – including all the evidence discussed throughout this opinion and the inferences that can be drawn therefrom – we conclude that Gillett's convictions were neither based on insufficient evidence nor against the overwhelming weight of the evidence. In addition to the physical evidence the State introduced at trial, the State presented a witness who testified that Gillett had confessed to him that he, Gillett, had taken the white pickup truck he was driving from its owners and that he had murdered them. Another witness testified that Gillett had confessed to her that he needed to get rid of the white pickup truck he was driving because two bodies were in the back of the truck. A rational trier of fact could have found the essential elements of the crime of capital murder beyond a reasonable doubt. Similarly, the verdict was not so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction

56

unconscionable injustice. Therefore, the trial court did not err in finding that the conviction was based on sufficient evidence and not against the overwhelming weight of the evidence.

## *PENALTY PHASE*

**XII. Whether the trial court erred in allowing the jury instructions regarding the Mississippi Code Section 99-19-101(5) aggravating circumstances of "avoiding arrest," "previous violent felony," "especially heinous capital offense," and "felony murder."**

¶104. Gillett argues that the jury should not have been instructed, through S-5-S and S-6-S, to consider whether "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest . . . ." Miss. Code Ann. § 99-19-101(5)(e) (Rev. 2007).

¶105. First, a trial court's decision to allow or deny a jury instruction is reviewed for abuse of discretion. *Rubenstein*, 941 So. 2d at 787. Second, this Court has held that "[i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance." *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983).

¶106. Gillett contends that there is no evidence that Gillett killed the victims to avoid arrest, and that taking the bodies to Kansas to avoid arrest is not the same as killing to avoid arrest. In response, the State argues that "[i]t was entirely reasonable for the jury to conclude that the victims were murdered to conceal the identity of the killers and to avoid any investigation into the robbery." Based on review of the record, "it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their

tracks' so as to avoid apprehension and eventual arrest by authorities." *Id.* Therefore, the

trial court did not abuse its discretion in allowing the avoiding-arrest aggravator to be

included in instructions S-5-S and S-6-S.

¶107. Gillett next argues that the jury should not have been instructed, through S-5-S and

S-6-S, to consider whether "[t]he defendant was previously convicted . . . of a felony

involving the use or threat of violence to the person." Miss. Code Ann. § 99-19-101(5)(b)

(Rev. 2007). Resolving this issue requires analysis of whether Gillett's September 27, 2004,

conviction for attempted aggravated escape from custody in the District Court of Ellis County,

Kansas, under Kansas Statutes Section 21-3810, constitutes a "felony involving the use or

threat of violence to the person." Miss. Code Ann. § 99-19-101(5)(b) (Rev. 2007). Kansas

Statutes Section 21-3810 provides:

> Aggravated escape from custody is:
> (a) Escaping while held in lawful custody (1) upon a charge or conviction of a
> felony . . . or
> (b) Escaping effected or facilitated by the use of violence or the threat of
> violence against any person while held in lawful custody (1) on a charge or
> conviction of any crime . . . .

 Kan. Stat. Ann. § 21-3810 (Rev. 2007) (repealed 2010).[17]

¶108. The State submitted to the trial court a complaint (which the State explained is the

equivalent of an indictment in Mississippi) alleging the attempted aggravated escape and also

a judgment of conviction for the attempted aggravated escape, both of which the State wished

---

[17] Kansas Statutes Section 21-3810 was repealed and replaced by 2010 Kansas Session Laws, chapter 136, section 136(b); however, the relevant language of the repealed statute is primarily the same as the language included in the session laws.

to introduce during its case-in-chief at the penalty phase to support the "previous violent felony" aggravator. Gillett objected to use of the complaint because it contained allegations of offenses for which Gillett had not been convicted. The trial court ruled that the complaint, for this reason, could not be entered into evidence for review by the jury. However, the trial court ruled that it would verbally inform the jury that Gillett had been convicted of attempted aggravated escape from custody in Kansas.

¶109. On appeal, Gillett argues that: 1) under *Hansen v. State*, 592 So. 2d 114, 145 (Miss. 1991), escape does not satisfy the Section 99-19-101(5)(b) aggravator; 2) the documents the State presented to the trial court "do not sufficiently provide a factual basis to support the aggravating circumstance of a prior violent felony;" and 3) the State "has the burden to prove that this conviction in Kansas would also be a proper conviction in Mississippi for a prior violent felony."

¶110. Gillett is correct that this Court has held that an escape conviction does not constitute "a felony involving the use or threat of violence to the person" under Section 99-19-101(5)(b). *Hansen v. State*, 592 So. 2d 114, 145 (Miss. 1991). Moreover, Kansas Statutes Section 21-3810 provides that a person can be found guilty of aggravated escape from custody not only when the escape is "effected or facilitated by the use of violence or threat of violence against any person while held in lawful custody . . . " (Kan. Stat. Ann. § 21-3810(b) (Rev. 2007) (repealed 2010)), but also for merely "escaping while held in lawful custody (1) upon a charge or conviction of a felony . . . ." (Kan. Stat. Ann. § 21-3810(a) (Rev. 2007) (repealed 2010)). Even the State admits that, "[a]s the statute reads it is clear that not every escape can be

59

considered a crime of violence." The facts surrounding and supporting the Kansas conviction for attempted aggravated escape are unknown; the State merely offered a judgment of conviction to secure inclusion of the Section 99-19-101(5)(b) aggravator. Lastly, "[t]he State has th[e] burden of proving beyond a reasonable doubt the existence of each aggravating circumstance." *Holland v. State*, 587 So. 2d 848, 874. (Miss. 1991).

¶111.   The State did argue to the trial court that there is a Kansas case explaining that even an escape that does not involve violence is violent in the sense that in "apprehending you, you are putting people in jeopardy, both citizens and law enforcement" and "because of what can happen, not necessarily what did happen." The State, however, has not provided this Court a citation to that Kansas case. Additionally, this Court has held that "[f]or a conviction to qualify as predicate for an aggravating circumstance under this state's statutes, the conviction from the sister state must have been acquired under a statute which has as an element the use or threat of violence against the person [which Kansas Statutes Section 21-3810(a) does not necessarily have] or, by necessity, must involve conduct that is inherently violent or presents a serious potential risk of physical violence to another." *Holland*, 587 So. 2d at 874.

¶112.   The State, which has not provided this Court the citation to the Kansas case that allegedly finds all escapes to be violent, has failed to provide sufficient evidence to support the inclusion of a "previous violent felony" jury instruction. Miss. Code Ann. § 99-19-101(5)(b) (Rev. 2007). *See Taylor v. State*, 672 So. 2d 1246, 1276 (Miss. 1996) (explaining that, in order for a jury instruction regarding an aggravating factor to be permissible, the State must provide evidence that could substantiate the jury's finding of that aggravating factor).

60

Therefore, the trial court erred in instructing the jury, through S-5-S and S-6-S, to consider whether "[t]he defendant was previously convicted of . . . a felony involving the use or threat of violence to the person." Miss. Code Ann. § 99-19-101(5)(b) (Rev. 2007).[18]

¶113. However, Mississippi Code Section 99-19-105(3)(d) provides:

> Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105(3)(d) (Rev. 2007).

¶114. The mitigating evidence presented at the sentencing hearing consisted of the following: a pastor, a retired pastor, and one of Gillett's fellow inmates testified that, while incarcerated, Gillett has become a religious Christian who leads Bible studies and helps other inmates grow as Christians; the owner of a landscaping business for whom Gillett worked for nearly a year in 1997 or 1998 testified that Gillett was a conscientious employee who produced high-quality work and would be a useful addition to a maintenance or landscaping crew; a man who was friends with Gillett from about 2001 to 2003 testified regarding Gillett's heavy drug use during that time period; Gillett's grandfather's companion, who has known Gillett since he

---

[18] This Court has held that, when determining whether a conviction under a sister state's statute constitutes a "felony involving the use or threat of violence to the person" under Mississippi Code Section 99-19-101(5)(b), it must be determined whether the conviction under the sister state's statute would be considered a crime of violence under Mississippi law. *Holland*, 587 So. 2d at 874 ("[D]etermining whether a defendant's prior conviction was a felony involving the use or threat of violence requires that this state's statutes be construed and applied. Where as here the conviction occurred in a sister state, this Court does not look to how that state characterizes the question of whether the crime was one of violence, rather, the analysis must be done under Mississippi law"). This Court cannot without further information – and need not, given the discussion above – analyze whether Gillett's attempted escape would be considered a crime of violence under Mississippi law.

was a teenager, testified that she knew Gillett to be respectful, friendly, outgoing, and helpful in that he had done yard work and fixed things at her and his grandfather's house; and lastly, Gillett's aunt and mother testified regarding Gillett's childhood and adult life.

¶115. According to his mother's and aunt's testimony, Gillett had an unstable childhood in the sense that he and his mother moved frequently, but his mother was a loving parent who, along with several of his extended family members, made themselves available to Gillett as a source of support throughout his life. Gillett was a smart child who did well in school, played some sports, and was very involved in Boy Scouts. Gillett's father was an alcoholic throughout Gillett's early childhood, which resulted in his parents getting divorced and Gillett not having the presence of a loving father in his daily life. But when his father became sober, Gillett formed a very good relationship with him, which lasted until his father passed away unexpectedly from a heart attack when Gillett was thirteen or fourteen years old. At the time Gillett's father suffered the heart attack, Gillett was living with his father, and Gillett was the one who called for help for his father. Gillett got his GED, attended some college, and got married, but after his wife asked for a divorce, he was devastated and started using drugs and acting unlike the person his mother knew as her son.

¶116. We find that this information about Gillett, presented as mitigating evidence, does not outweigh the remaining three aggravating circumstances – "avoiding arrest," "especially heinous capital offense," and "felony murder" – all of which are supported by the evidence. Therefore, the inclusion of the invalid "previous violent felony" aggravator was harmless error.

¶117. Gillett next argues that the trial court erred in giving instruction S-4-S, regarding the Section 99-19-101(5)(h) "especially heinous, atrocious or cruel" aggravator. Gillett contends that the instruction is unconstitutionally vague. This Court, however, has found instructions identical to S-4-S to be acceptable in numerous cases, including *Havard v. State*, 928 So. 2d 771 (Miss. 2006), in which it stated:

> The trial court's sentencing instruction S-9 defined for the jury what constituted a heinous, atrocious, or cruel (HAC) capital offense and instructed the jury that it may consider such, if found, an aggravating circumstance. [The defendant] concedes in his brief to this Court that we have held this instruction to be constitutionally sufficient. Nonetheless, [the defendant] challenges this instruction to be constitutionally vague. The instruction read as follows:
>
> > The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
> >
> > An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders – the conscienceless or pitiless crime which is unnecessarily tortuous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, or that a lingering or tortuous death was suffered by the victim, then you may find this aggravating circumstance.
>
> This issue is quickly laid to rest. "This Court has repeatedly held that the 'especially heinous, atrocious or cruel' provision of Miss. Code Ann. § 99-19-101(5)(h) is not so vague and overbroad as to violate the United States Constitution." *Stevens v. State*, 806 So. 2d 1031, 1060 (Miss. 2001). *See also Crawford v. State*, 716 So. 2d 1028 (Miss. 1998); *Mhoon v. State*, 464 So. 2d 77 (Miss. 1985); *Coleman v. State*, 378 So. 2d 640 (Miss. 1979). Indeed [the

63

defendant] himself concedes this Court's recognition of the constitutionality of this instruction. Despite this concession, [the defendant] urges this Court to find that the United States Supreme Court in *Shell v. Mississippi*, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990) held this instruction unconstitutional. We briefly revisit what we stated a little more than a year ago with regard to this same challenge:

> [The defendant] argues that first paragraph of the above instruction was held unconstitutional by the United States Supreme Court in *Shell v. Mississippi*, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990). [The defendant] further contends that in *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), this Court announced that the language held unconstitutional in *Shell* should not be submitted to juries. Therefore, [the defendant] concludes that Instruction SP-2 has been determined by the United States Supreme Court and this Court to be per se objectionable. In *Shell*, the Supreme Court found that when used alone, language identical to that used in the first paragraph of instruction SP-2 was not constitutionally sufficient. 498 U.S. at 2, 111 S. Ct. 313, 112 L. Ed. 2d 1. *However, in Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990), *the Supreme Court determined that the first sentence of the second paragraph was a proper limiting instruction when used in conjunction with the language from Shell.* This Court has repeatedly held this identical instruction to be constitutionally sufficient. *See Knox v. State*, 805 So. 2d 527, 533 (Miss. 2002); *Puckett v. State*, 737 So. 2d 322, 359-60 (Miss. 1999); *Jackson v. State*, 684 So. 2d 1213, 1236-37 (Miss. 1996).

*Thorson v. State*, 895 So. 2d 85, 104 (Miss. 2004) [(emphasis added)]. [The defendant] invites us to overturn firmly entrenched Mississippi precedent on this issue. We decline to do so. For these reasons, this issue is without merit.

*Havard*, 928 So. 2d at 799-800. Gillett's arguments regarding the unconstitutionality of instruction S-4-S fail for the same reasons the arguments of the defendant in *Havard* failed.

As this Court has repeatedly held this exact jury instruction to be constitutionally sufficient, we find that the trial court did not err in giving this instruction.

64

¶118. Next, Gillett argues that the trial court erred in allowing the jury to consider the "felony murder" aggravating circumstance – i.e., the aggravating circumstance that the capital offense took place while Gillett "was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, [a] robbery . . . ." Miss. Code Ann. § 99-19-101(5)(d) (Rev. 2007). Gillett argues that, under **Ring v. Arizona**, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), and **Apprendi v. New Jersey**, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), the aggravating circumstance of "committing the offense while engaged in robbery" should not have been presented to the jury during the penalty phase, because allegations of robbery are what led to the capital murder conviction in the guilt phase. Gillett concedes that this Court has ruled contrary to this argument, stating "to the extent that this Court has ruled contrary to the argument in this Claim, these holdings should be overruled."

¶119. This Court has held that the alleged felony underlying the capital-murder conviction may properly be used as an aggravator. In **Ross v. State**, 954 So. 2d 968 (Miss. 2007), this Court stated:

> Relying primarily on **Ring** and **Apprendi**, [the defendant] maintains that the use of the underlying felony of armed robbery as an aggravating circumstance upon which the jury relied in returning a sentence was improper. However, evidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance. *See Bennett*, 933 So. 2d at 954; **Goodin v. State**, 787 So. 2d 639, 654 (Miss. 2001); **Smith**, 729 So. 2d at 1223; **Bell v. State**, 725 So. 2d 836, 859 (Miss. 1998); **Crawford v. State**, 717 So. 2d 1028, 1049-50 (Miss. 1998). Furthermore, the United States Supreme Court has held that there is no constitutional error in using the underlying felony as the aggravator. **Lowenfield v. Phelps**, 484 U.S. 231, 233, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). The Supreme Court stated in **Tuilaepa**

***v. California***, 512 U.S. 967, 972, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994), that "[t]he aggravating circumstances may be contained in the definition of the crime or in a separate sentencing factor (or in both)."

The use of the underlying felony as an aggravator was not error.

***Ross v. State***, 954 So. 2d 968, 1014 (Miss. 2007).

¶120. Within this claim that it was improper to instruct the jury on the aggravating circumstance of "committing the offense while engaged in robbery," Gillett argues that he has a constitutional right to have had the alleged aggravating circumstances included in his indictment. This Court specifically addressed this issue in ***Spicer v. State***, 921 So. 2d 292, 319 (Miss. 2006), in which it explained:

> This Court has previously rejected the argument made by [the defendant] [that his death penalty sentence must be vacated because the indictment failed to include a statutory aggravating factor or the mens rea standard required for capital murder]. *See, e.g.,* ***Brown v. State***, 890 So. 2d 901, 918 (Miss. 2004); ***Stevens v. State***, 867 So. 2d 219, 225-27 (Miss. 2003). We have held that ***Apprendi*** and ***Ring*** address issues wholly distinct from the present one, and in fact do not address indictments at all. ***Brown***, 890 So. 2d at 918. The purpose of an indictment is to furnish the defendants notice and a reasonable description of the charges against them so that they may prepare their defense. ***Williams v. State***, 445 So. 2d 798, 804 (Miss. 1984). Therefore, an indictment is only required to have a clear and concise statement of the elements of the crime the defendant is charged with. ***Id.*** "Our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment." ***Brown***, 890 So. 2d at 918. Therefore, when [the defendant] was charged with capital murder, he was put on notice that the death penalty may result, what aggravating factors may be used and the mens rea standard that was required. *See* ***Stevens***, 867 So. 2d at 227. We find that [the defendant's] ninth assertion of error is without merit.

***Spicer***, 921 So. 2d at 319.

¶121. Therefore, we find that the jury instruction regarding the aggravating circumstance of "committing the offense while engaged in robbery" was properly given and that Gillett did not have a right to have the alleged aggravating circumstances included in his indictment.

**XIII. Whether the trial court erred in denying Gillett's proposed jury instructions that separately listed nonstatutory mitigating circumstances.**

¶122. Gillett's next assignment of error is that the trial court refused to instruct the jury regarding his theory of defense at the penalty phase by refusing to give his "theory of defense instructions," namely DA-30, DA-31, DA-49, DA-50, DA-51, DA-52, DA-53, DA-54, DA-55, DA-56, and DA-59, which separately listed nonstatutory mitigating circumstances.

¶123. While the trial court denied these nonstatutory-mitigator jury instructions, it did provide the following "catch-all" jury instruction regarding mitigating circumstances:

> Consider the following elements of mitigation in determining whether the death penalty should not be imposed:
>
>> Any aspect of the Defendant's character or record and any of the circumstances of the offense that the Defendant proffers as a basis for a sentence less than death.

¶124. This Court has held that "[s]pecific instructions on non-statutory circumstances need not be given, so long as a 'catch-all' instruction is included that instructs the jury that they may consider any factors that they may deem mitigating in their deliberations." *Ross v. State*, 954 So. 2d 968, 1011 (Miss. 2007). The *Ross v. State* Court continued:

> This Court has also held that "catch-all" instructions do not limit the jury's consideration of mitigating factors. *Simmons v. State*, 805 So. 2d 452, 499 (Miss. 2001). Under the list of statutory mitigating circumstances in the first sentencing instruction, the trial court instructed the jury that they may consider:

> Any other matter, any other aspect of the defendant's character or record, and any other circumstance of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the defendant.
>
> The instruction properly informs the jury about what may be considered as mitigation evidence. Therefore, the trial court's refusal of [the defendant's] proposed instruction does not constitute error.

*Id.* In addition, this Court has stated that "the use of the catch-all instruction eliminates the possibility 'that the jury was unconstitutionally foreclosed from considering all mitigating circumstances.'" *Manning v. State*, 735 So. 2d 323, 352 (Miss. 1999) (quoting *Berry v. State*, 703 So. 2d 269, 287 (Miss. 1997)). "A catchall instruction is sufficient to encompass non-statutory mitigating factors." *Id.* (quoting *Lester v. State*, 629 So. 2d 755, 799 (Miss. 1997)).

¶125. Therefore, the catch-all instruction the trial court gave was sufficient to encompass the nonstatutory mitigating factors that Gillett argues should have been listed separately (through inclusion of DA-30, DA-31, DA-49, DA-50, DA-51, DA-52, DA-53, DA-54, DA-55, DA-56 and DA-59). Accordingly, we find that the trial court did not err in refusing to give these proposed instructions.

**XIV. Whether the trial court erred in its acceptance or denial of various other penalty-phase jury instructions.**

¶126. Gillett's next assignment of error is that the trial court abused its discretion in its acceptance or denial of various other penalty-phase jury instructions. Gillett first argues that the trial court should not have given S-1-S, which instructed:

> You should consider and weigh aggravating and mitigating circumstances, as set forth in another instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

Gillett argues that this instruction was contrary to law that holds the jury may consider sympathy.

¶127. This Court previously has reviewed instructions similar to S-1-S and has found them to be proper. In *Howell v. State*, 860 So. 2d 704 (Miss. 2003), this Court explained:

> In *Turner v. State*, 732 So. 2d at 952, . . . [t]his Court upheld the [jury instruction language] which stated "You should consider and weigh aggravating and mitigating circumstances, as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." *Turner v. State*, 732 So. 2d at 952. *See also Evans v. State*, 725 So. 2d 613, 690-91 (Miss. 1997); *Holland v. State*, 705 So. 2d 307, 351-52 (Miss. 1997). Indeed, this Court held that a defendant is not entitled to a sympathy or mercy instruction and allowing such an instruction results in a jury verdict that is based on "whim and caprice." *Id.* (citing *Holland v. State*, 705 So. 2d 307, 351-52 (Miss. 1997)). In *Turner*, this Court found that "pity", "mercy" and "sympathy" are synonymous. *Id.* Case law precedent clearly allows an instruction such as that given to the jury in this case. Accordingly, this issue is without merit.

*Howell*, 860 So. 2d at 760. Therefore, the trial court did not err in giving instruction S-1-S.

¶128. Gillett also claims that the trial court erred in denying instruction DA-61, which read "I instruct you that you may not totally disregard sympathy for Mr. Gillett in your deliberations as to the appropriate sentence in this matter." As this Court has noted, "a defendant is not entitled to a sympathy or mercy instruction and allowing such an instruction results in a jury verdict that is based on 'whim and caprice.'" *Id. See also id.* at 759 ("This Court has repeatedly held that 'capital defendants are not entitled to a mercy instruction.' *Jordan v. State*, 728 So. 2d 1088, 1099 (Miss. 1998) . . . . 'The United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could

induce a jury to base its sentencing decision upon emotion, whim, and caprice instead of upon the evidence presented at trial.' *Id.* . . . .").[19] Therefore, the trial court did not err in denying instruction DA-61.

¶129. Gillett next argues that the trial court erred in giving instructions S-2-S and S-7-S, contending that they were contradictory, and that S-2-S was unlawful. S-2-S read:

> You are advised that just because these instructions have listed certain mitigating circumstances you are allowed to consider, does not mean that those or any other mitigating circumstances exist. It is only for you, the jury, to determine which mitigating circumstances exist.

Gillett argues that instructing the jury that "It is only for you, the jury, to determine . . . " as opposed to instructing something like, "It is for each individual juror to determine . . . ," makes S-2-S an incorrect statement of the law.

¶130. Gillett argues that S-7-S is a correct statement of the law, and contradictory to S-2-S. S-7-S stated:

> The Court instructs that you, as individual jurors, must consider mitigating circumstances. Therefore, even if all other eleven jurors find that a certain mitigating circumstance does not exist, if you believe it does exist, you must find that mitigating circumstance, and weigh it in your further deliberations.

After Gillett objected to S-2-S at trial and the parties discussed the instruction, the trial court stated: "I am going to give both of them. Take them together is a correct statement of the law."

---

[19] The two cases Gillett cites as authority for instruction DA-61 – *Jordan v. State*, 786 So. 2d 987, 1025 (Miss. 2001), and *King v. State*, 784 So. 2d 884, 889 (Miss. 2001) – do not suggest that Gillett is entitled to this instruction.

¶131. We agree with the trial court that, given together, S-2-S and S-7-S provide a correct statement of the law. *See **Brown v. State***, 890 So. 2d 901, 919 (Miss. 2004) ("On review of jury instructions, we do not isolate the individual instruction attacked, but rather we read all of the instructions as a whole."). Moreover, this Court has held that an instruction such as S-2-S, which references the jury members using the phrase "you, the jury," does not imply that the jury must act unanimously when considering the existence of mitigating circumstances. ***Evans v. State***, 725 So. 2d 613, 694 (Miss. 1997).

¶132. Therefore, because S-2-S is not inconsistent with S-7-S, and moreover because S-2-S standing alone would not be an improper instruction, the trial court did not err in giving these two instructions.

¶133. Gillett goes on to argue that the trial court further erred in refusing his proposed instructions ("DA-28, DA-29, DA-40 and/or DA-44"[20]), which he argues "would have,

---

[20] These instructions read as follows:

DA-28:

> Unlike the consideration of an aggravating circumstance, there is no unanimity requirement in consideration of mitigating circumstances.
> Mitigating circumstances differ from aggravating circumstances because you are not required to be convinced beyond a reasonable doubt that a mitigating circumstance exists before you must take that circumstance into account as you deliberate this case. You may consider a mitigating circumstance if you believe that there is any evidence to support it no matter how weak you determine that evidence to be. Each of you must decide for yourself what weight and what consideration is to be given mitigating circumstances.

DA-29:

> Because each of you must consider what is mitigating and what is not, it is

potentially at least, alleviated the disastrous inconsistency caused by S-2-S and S-7-S." As

just stated, S-2-S and S-7-S are not inconsistent. Therefore, the trial court did not err in

refusing to give additional jury instructions that Gillett argues were necessary to remedy the

alleged inconsistency.

¶134. Gillett next argues that the trial court erred in denying instruction DA-13, which stated:

> As the death penalty is never required, you may always find that Mr. Gillett should be sentenced to life in prison or life without the possibility of parole.

However, within instruction DA-37, the jury was instructed, "You, the jury, always have the

option to sentence Mr. Gillett to life imprisonment, whatsoever findings you make." Thus,

---

impossible for me to list for you every possible factor that you might consider mitigating. For that reason you should not assume anything about the weight of aggravating circumstances versus the weight of mitigating circumstances based on the fact that the possible aggravating circumstances are listed for you while all the possible mitigating circumstances are not listed for you. Each of you must identify in your own mind what mitigating circumstances you find to exist, and each of you could have different mitigating circumstances in mind.

DA-40:

> As each of you is free to consider any other matter which you may deem to be mitigating on behalf of Mr. Gillett in reaching your sentencing decision, and as each of you maintains the option to sentence Mr. Gillett to life imprisonment whatever findings you may make, I instruct you as follows: you need not unanimously determine that a death sentence is inappropriate in this matter before you move on to consider a sentence less than death. Each one of you is allowed to give due consideration to whatever factors you believe call for a sentence less than death.

DA-44:

> The Court instructs the jury that each of you must decide for yourself whether death or life imprisonment without parole is the appropriate punishment for Mr. Gillett.

72

the substance of DA-13 was fairly covered elsewhere in the jury instructions, and the trial court did not err in denying it.

¶135. Next, Gillett argues that the trial court erred in denying his "presumption-of-life" instructions: DA-10, DA-11, DA-19, and DA-39. This Court addressed the issue of whether a defendant is entitled to presumption-of-life instructions in ***Brown v. State***, where it held:

> We have repeatedly said that we reject the "proposition that a defendant should go into the sentencing phase with a presumption that life is the appropriate punishment." ***Watts v. State***, 733 So. 2d 214, 241 (Miss. 1999) (internal quotes and citation omitted); *see also* ***Jackson v. State***, 684 So. 2d 1213, 1233 (Miss. 1996). We adhere to that standard today. Because the judge did not abuse his discretion in excluding the proposed instructions, this assignment of error is without merit.

***Brown v. State***, 890 So. 2d 901, 920 (Miss. 2004).

¶136. Moreover, even though Gillett was not entitled to a presumption-of-life instruction, the trial court instructed the jury regarding this issue in instructions DA-37 and DA-65. DA-37 stated:

> You may sentence Mr. Gillett to life imprisonment if you find that only one mitigating circumstance exists and multiple aggravating circumstances exist. You may also sentence Mr. Gillett to life imprisonment if you find that no mitigating circumstance exists. You are not required to find any mitigating circumstance in order to return a sentence of life imprisonment. Similarly, the finding of an aggravating circumstance does not require that you return a sentence of death, nor would your individual determination that aggravating circumstances outweigh mitigating circumstances.
>
> You, the Jury, always have the option to sentence Mr. Gillett to life imprisonment, whatsoever findings you make.

DA-65 stated:

Only if all twelve of you unanimously agree beyond a reasonable doubt that death is the appropriate punishment may you impose the sentence of death. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if you are convinced it is wrong. On the other hand, do not surrender your honest conviction as to what you feel the sentence in the case should be just because of the opinions of your fellow jurors or just so that you can all agree on a verdict.

Thus, it was made clear to the jury that it could choose to sentence Gillett to life imprisonment regardless of the findings it made in the penalty phase, and the general substance of Gillett's proposed presumption-of-life instructions was communicated to the jury through DA-37 and DA-65.

¶137. Therefore, the trial court did not err in refusing Gillett's presumption-of-life jury instructions, numbered DA-10, DA-11, DA-19, and DA-39.[21]

¶138. Gillett next argues that the trial court erred in denying instructions DA-66 and DA-67, which advise the jury of the consequences of its failure to agree unanimously on a sentence. DA-66 stated: "If you cannot, within a reasonable time, agree as to punishment, I will dismiss you and impose a sentence of life without the benefit of parole. If you cannot agree, know that any of you may inform the bailiff of this." D-67 stated: "If you fail to reach a verdict as to penalty this will have no effect on the verdict you have already returned at the guilt trial.

---

[21] As additional reasons for excluding Gillett's presumption-of-life instructions, the State argues that DA-10 and DA-39 were flawed in that they were mercy instructions and contained improper burdens of proof, and that DA-37 (which was given) was flawed in that it was a mercy instruction. Because of the analysis above, these arguments need not be addressed. We emphasize that we are not commenting on whether it was proper to give DA-37, as this instruction was offered by Gillett and obviously not challenged by him.

If you do not reach a verdict as to penalty, Mr. Gillett will be sentenced [*sic*] life imprisonment without the possibility of parole or probation."

¶139. This Court reviewed nearly identical instructions in *Edwards v. State*, 737 So. 2d 275 (Miss. 1999), and found that the trial court did not err in denying them. The *Edwards* Court explained:

> [The defendant] also assigns as error the trial court's refusal of Instruction D-S10 which read:
>
> *The court instructs the jury that if you do not agree upon punishment the court will sentence the defendant to life imprisonment without possibility of parole or early release.*
>
> He claims that this instruction correctly stated the law according to Miss. Code Ann. § 99-19-103 [as does Gillett]. Miss. Code Ann. § 99-19-103 (1994) provides that "[i]f the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life."
>
> However, jury instructions "are not to be read unto themselves, but with the jury charge as a whole. . . . Instructions CS-2 and CS-3 make clear the options the jury had in returning to the courtroom:
>
> > (1) . . . we . . . unanimously find the Defendant should suffer death.
> >
> > (2) We, the Jury, find that the Defendant should be sentenced to life imprisonment without the possibility of parole or early release.
> >
> > (3) We, the Jury are unable to unanimously agree on punishment.
>
> Thus, when read as a whole, the jury instructions properly informed the jury that it could return to the courtroom and report that it was unable to agree unanimously on punishment. *Wilcher v. State*, 697 So. 2d 1123, 1136 (Miss. 1997). D-S10 was a cumulative instruction. There is no error in the denial of a cumulative instruction. *Walker v. State*, 671 So. 2d at 613.

75

> Moreover, even if the jury had never been instructed on what would happen if they could not agree, there would have been no error. In ***Stringer v. State***, this Court held that the trial judge did not err by failing to inform the jury that, "if they were unable to agree within a reasonable time on the punishment to be imposed, [the defendant] would be sentenced to life imprisonment." ***Stringer***, 500 So. 2d 928, 945 (Miss. 1986).

***Wilcher v. State***, 697 So. 2d at 1136-37. Therefore, this assignment of error is without merit.

***Edwards***, 737 So. 2d at 316-17.

¶140. In the instant case, as in ***Edwards***, the jury was instructed (in S-5-S and S-6-S) regarding the three potential outcomes they could reach: death, life imprisonment without parole, or inability to agree unanimously on a punishment. Thus, read as a whole, the jury instructions properly informed the jury that it could return to the courtroom and report an inability to agree unanimously on a punishment. Therefore, because this Court has held that instructions like DA-66 and DA-67 are not required and also that they are cumulative in cases like the instant case, the trial court did not err in denying these instructions.

¶141. Gillett next argues that the trial court erred in denying instructions DA-5 and DA-63. DA-5 stated:

> You have found Mr. Gillett guilty of capital murder. You must now decide the appropriate punishment in this case.

> Before I instruct you on specific matters regarding Mr. Gillett's sentence, I will instruct you on the general principles that will govern your deliberations in this sentencing phase.

> In explaining your duties, I must offer as complete an explanation as possible concerning the legal matters that must govern your deliberations. I cannot stress to you enough that the focus of your deliberations during this

phase is not the same as in an ordinary case. *Punishment by death is a unique punishment. It is final. It is irrevocable. You must render a decision based on the evidence free from anger and prejudice.*

(Emphasis added.) The State objected to this instruction at trial, stating: "The instruction is fair until you get down to the third to last line. It's a comment that is inappropriate in a jury instruction. It's: Punishment by death is a unique punishment."

¶142. In *Thorson v. State*, this Court reviewed an instruction nearly identical to the italicized portion of DA-5 above, and found no error in the trial court's denial of the instruction. *Thorson v. State*, 895 So. 2d 85, 109-110 (Miss. 2004). The *Thorson* Court explained:

> [The defendant] cites three cases to support these propositions. *Woodson v. North Carolina*, 428 U.S. 280, 303-04, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976) ("[D]eath is a punishment different from all other sanctions in kind rather than degree."); *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S. Ct. 2909, 2931, 49 L. Ed. 2d 859 (1976) ("[D]eath as a punishment is unique in its severity and irrevocability."); *Flores v. Johnson*, 210 F. 3d 456, 459 (5th Cir. 2000) ("Death is the most final, and most severe, of punishments."). While these general propositions are true, none of these cases stands for the proposition that the jury must receive an instruction stating that a death sentence proceeding is different from an ordinary criminal proceeding. [The defendant] has failed to cite any relevant authority in support of this assertion. This Court has continuously held that such failure to cite relevant authority "obviates the appellate court's obligation to review such issues." *Simmons v. State*, 805 So. 2d at 487 (citing *Williams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998)). Therefore, this issue is not properly before the Court and is procedurally barred from our consideration.

*Thorson*, 895 So. 2d at 109-10. In the instant case, to support his argument that DA-5 should have been given, Gillett cites the same three cases the defendant in *Thorson* cited, as well as *Gilmore v. Taylor*, 508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993). *Gilmore*, like the other three cases, does not stand for the proposition that the jury must receive an

instruction stating that a death-sentence proceeding is different from an ordinary criminal proceeding. *See Thorson*, 895 So. 2d at 109-10.

¶143. Gillett goes on to argue that, even if this Court finds that the State's objection to a portion of DA-5 was well-taken, this Court must then consider whether the trial court erred in refusing the remainder of DA-5. First, regarding the final sentence of DA-5 – "You must render a decision based on the evidence free from anger and prejudice." – we note that S-1-S fairly covered this by instructing, " . . . you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Second, after the trial court refused DA-5, Gillett did not request that the portion of DA-5 to which no specific objection was made be given, and the trial court does not have an obligation to give instructions *sua sponte* nor to give every instruction allowable in a capital case. *Gray v. State*, 728 So. 2d 36, 60 (Miss. 1998); *Jordan v. State*, 786 So. 2d 987, 1025 (Miss. 2001).

¶144. Therefore, the trial court did not err in denying DA-5.

¶145. As mentioned, Gillett also contends that the trial court erred in denying DA-63, which stated:

> If Roger Gillett is sentenced to life imprisonment without the possibility of parole or early release then he will spend the rest of his natural life incarcerated by the Mississippi Department of Corrections. His life sentence without possibility of probation or parole cannot be reduced or suspended.
>
> The court instructs the jury that if you sentence Mr. Gillett to death, he will be executed by the State of Mississippi.

In *Flowers v. State*, 842 So. 2d 531 (Miss. 2003), this Court was presented with the question of whether a jury should receive an instruction clarifying what life without parole means. The

78

*Flowers* Court held that, "[b]y giving only the sentencing options of death or life imprisonment without parole, the trial judge properly gave the jury all the instructions that were needed." *Flowers*, 842 So. 2d at 556-57. Therefore, since the jury in the instant case was informed of the sentencing options of death or life imprisonment without parole, the trial court did not err in denying DA-63.

¶146. Next, Gillett argues that the trial court erred in denying his mercy instruction, instruction DA-38, which stated: "The appropriateness of the exercise of mercy can itself be a mitigating factor you may consider in determining whether the State had proved beyond a reasonable doubt that the death penalty is warranted." Gillett cites *Kansas v. Marsh*, 548 U.S. 163, 176 n.3, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006) as support for this instruction, and argues that Gillett "was constitutionally entitled to Instruction DA-38 in light of the instructional error briefed [above, under this section heading]."

¶147. This Court reviewed this exact instruction in *Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008), and held that the trial court did not abuse its discretion in refusing it. The *Chamberlin* Court explained:

> Chamberlin argues that *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), required the trial court to give a mercy instruction in this case. However, *Marsh* does not speak to or even consider the issue of whether a mercy instruction is required. Rather, the *Marsh* Court held that "the States enjoy a constitutionally permissible range of discretion in imposing the death penalty." *Marsh*, 126 S. Ct. at 2525 (quoting *Blystone v. Pennsylvania*, 494 U.S. 299, 308, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990)) (internal quotations omitted). "[T]he States are free to determine the manner in which a jury may consider mitigating evidence," i.e., whether the evidence should be viewed through the lens of mercy. *Marsh*, 126 S. Ct. at 2523.

That discretion allows trial courts to avoid the potential arbitrariness of an emotional decision encouraged by a mercy instruction.

This Court has repeatedly held that "capital defendants are not entitled to a mercy instruction." *Jordan v. State*, 728 So. 2d 1088, 1099 (Miss. 1998) (citing *Underwood v. State*, 708 So. 2d 18, 37 (Miss. 1998); *Hansen v. State*, 592 So. 2d 114, 150 (Miss. 1991); *Williams v. State*, 544 So. 2d 782, 788 (Miss. 1987); *Lester v. State*, 692 So. 2d 755, 798 (Miss. 1997); *Jackson v. State*, 684 So. 2d 1213, 1239 (Miss. 1996); *Carr v. State*, 655 So. 2d 824, 850 (Miss. 1995); *Foster v. State*, 639 So. 2d 1263, 1299-1301 (Miss. 1994); *Jenkins v. State*, 607 So. 2d 1171, 1181 (Miss. 1992); *Nixon v. State*, 533 So. 2d 1078, 1100 (Miss. 19870). "The United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could induce a jury to base its sentencing decision upon emotion, whim, and caprice instead of upon the evidence presented at trial." *Id.* (citing *Saffle v. Parks*, 494 U.S. 484, 492-95, 110 S. Ct. 1257, 1262-64, 108 L. Ed. 2d 415 (1990)).

*Howell v. State*, 860 So. 2d 704, 759 (Miss. 2003). . . .

*Chamberlin v. State*, 989 So. 2d 320, 342 (Miss. 2008). Therefore, because *Marsh*, the sole case Gillett has offered as support for DA-38, does not in fact discuss whether a mercy instruction is required, and because this Court repeatedly has held that capital defendants are not entitled to a mercy instruction, we find that the trial court did not err in denying DA-38.

**XV. Whether there was prosecutorial misconduct during the guilt and penalty phases of the trial.**

¶148. Prior to trial, Gillett filed a "Notice of Forensic Argument Offered by the State in the Trial of the Co-Defendant that Will Be Objectionable if Offered by the State in this Matter." Gillett now argues that, "[n]otwithstanding more than two months notice of specific acts of forensic misconduct, the State repeated seven of the specific violations announced in Mr.

Gillett's notice."  Gillett then lists in his brief the seven alleged violations,[22] none of which

_____

[22] The seven alleged violations, as listed by Gillett, are as follows:

1. During second-phase summation, the State offered the jury its personal opinion that death is the appropriate sentence in this matter.  See R. 1767 ("If he gets the death penalty, I've done my job.  Now, I don't ask for the death penalty every time because I believe that the death penalty ought to be reserved for special people and special situations.  And, folks, if this isn't one of them, I'll probably never see one.  This is a special person over there and this is a special circumstance.").  This argument is improper as advocated in Item 2 of Mr. Gillett's notice.  See CP. 838.  This argument is also improper as it is analogous to a prosecutor arguing he personally believes the defendant is guilty.  See Item 1 of Mr. Gillett's notice at CP. 837-38.

2. During second-phase summation, the State offered the jury its personal opinion that "I can't imagine a worse way to go" (R. 1764) and "I have never seen a case this bad in my life.  Never." (R. 1765).  This argument was made in direct opposition to the facts and case authority cited in Item 3 of Mr. Gillett's pre-trial notice.  See CP. 838-40.

3. During second-phase summation, the State offered an improper "Golden Rule" argument contending that the jury should consider the way the decedents were killed when considering the import of mitigating evidence in the life-or-death decision.  See R. 1744-46.  This argument was made in direct opposition to the facts and case authority cited in Item 4 of Mr. Gillett's pre-trial notice.  See CP. 840-42.

4. During first-phase summation, the State improperly asked the jury to consider the families of the decedents in their deliberations.  See R. 1626 ("I ask you on behalf of this family that's sitting in this courtroom to give them justice and convict Roger Gillett . . .).  This argument was made in direct opposition to the facts and case authority cited in Item 5 of Mr. Gillett's pre-trial notice.  See R. 842-44.

5. During second-phase summation, the State advised the jury it was seeking justice on behalf of the decedents.  See R. 1759, 1766.  This argument was made in direct opposition to the facts and case authority cited in Item 4 of Mr. Gillett's pre-trial notice.  See R. 840-42.

6. During second-phase summation, the State advised the jury that returning a death sentence "means you are doing your duty under the laws of the State of Mississippi."  See 1746-47.  This argument was made in direct opposition to the facts and case authority cited in Item Eight of Mr. Gillett's pre-trial notice.  See CP. 846-48.

81

he objected to at trial. Gillett argues that "[t]here are instances where the failure to contemporaneously object to a prosecutorial violation during forensic argument shall only focus further attention on the violation and, therefore, does not foreclose appellate review of the violation," citing *United States v. Sawyer*, 347 F. 2d 372, 374 (4th Cir. 1965).[23] *Sawyer* states:

> While ordinarily, if defense counsel does not object during the course of the Government's closing argument he may be said to have waived the point, there may be instances where the failure to object to a grave violation stems from the attorney's fear that an objection would only focus attention on an aspect of the case unfairly prejudicial to his client. If the presiding judge perceives that trial counsel has been placed in this dilemma, it is the judge's duty, on his own initiative, to interrupt, admonish the offender, and instruct the jury to disregard the improper arguments.

*Sawyer*, 347 F. 2d at 374 (citations omitted).

¶149. In response, the State argues that there was no prosecutorial misconduct, but even if there were, Gillett is procedurally barred from raising the alleged instances of prosecutorial misconduct on appeal, because he failed to object contemporaneously at trial and also failed

---

7. During first-phase summation, the State advised the jury Vernon Hulett "was just a good human being. Vernon Hulett was the type of person that was the backbone of this country. He worked for a living. He worked for the city. Yes, he drank a little beer. I'm guilty of that, too. But you didn't see any drugs in his system. He's just a hard working innocent person." (R. 1573). These statements are entirely extra-record. As such, these statements, as they were in the trial of Mr. Gillett's co-defendant, are improper. More specifically, this argument was made in direct opposition to the facts and case authority cited in Item Twelve of Mr. Gillett's pre-trial notice. See CP. 852-53.

[23] We suspect that Gillett misspoke in this sentence. Gillett likely meant that there are instances where defense counsel may choose not to object contemporaneously to a prosecutorial violation out of fear that objecting would only focus more attention on the violation.

to raise these allegations in his motion for new trial. Further, the State contends that ***Sawyer*** supports the State's view, rather than Gillett's, in that the ***Sawyer*** Court ultimately held (in the paragraph directly following the quoted portion of ***Sawyer*** above):

> However, we are satisfied that in this case the conduct of the prosecutor is not open to criticism and that the reason no objection was voiced against the Assistant United States Attorney's argument is simply that the defense counsel perceived no ground for objection, as we perceive none.

***Id.*** at 374. The State argues that, "[a]s in ***Sawyer***, there were no grounds to object to the State's closing arguments and Gillett therefore sat silent."

¶150. First, this Court repeatedly has held that failure to object contemporaneously at trial waives any claim of error on appeal. ***Howell v. State***, 860 So. 2d 704, 756 (Miss. 2003); ***Walker v. State***, 671 So. 2d 581, 597 (Miss. 1995) ("This Court has repeatedly held that '[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case.'"); ***Williams v. State***, 684 So. 2d 1179, 1203 (Miss. 1996) ("'Where a defendant fails to object to a statement by the district attorney during closing argument, a motion for mistrial after the jury has retired to consider its verdict comes too late. . . . Put another way a *contemporaneous* objection to the allegedly prejudicial remarks is required.'" (citations omitted)); ***Lockett v. State***, 517 So. 2d 1317, 1333 (Miss. 1987) ("This Court on numerous occasions has refused to consider the issue of prosecutorial misconduct where the defendant did not raise it at trial and we so refuse to do so today."). This Court has explained the rationale for requiring contemporaneous objections:

> The Supreme Court is a court of appeals, it has no original jurisdiction; it can only try questions that have been tried and passed upon by the court from which

the appeal is taken. Whatever remedy appellant has is in the trial court, not in this court. This court can only pass on the question after the trial court has done so. . . .There are three basic considerations which underlie the rule regarding specific objections. It avoids costly new trial. It allows the offering party an opportunity to obviate the objection. Lastly, a trial court is not put in error unless it had an opportunity to pass on the question. . . . In death penalty cases, the contemporaneous objection rule is applicable.

*Williams*, 684 So. 2d at 1203 (internal quotations and citations omitted).

¶151. Furthermore, Gillett does not provide any support for the contention that, when each of the seven instances of alleged prosecutorial misconduct occurred, he chose not to object contemporaneously out of a concern that objecting would focus further attention on an aspect of the case unfairly prejudicial to his client.

¶152. Therefore, Gillett waived the right to raise these instances of alleged prosecutorial misconduct on appeal.

**XVI. Whether the trial court erred in allowing the introduction of autopsy photographs at the guilt and penalty phases.**

¶153. Gillett's next assignment of error is that the trial court erred in allowing autopsy photographs into evidence during the guilt and penalty phases. In *Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008), Chamberlin likewise objected to the admission of autopsy photographs of Vernon Hulett and Linda Heintzelman. *Chamberlin*, 989 So. 2d at 339-40. This Court, in finding that the trial court did not err in admitting the photographs, explained the standard of review and proper analysis that applies to a trial judge's admission of photographs:

> Admission of photographs by the trial court is reviewed for abuse of discretion. *Dampier v. State*, 973 So. 2d 221, 230 (Miss. 2008). A decision favoring

admissibility will not be disturbed absent a clear abuse of that judicial discretion. ***Id.*** The discretion of the trial judge is "almost unlimited . . . regardless of the gruesomeness, repetitiveness, and the extenuation of the probative value." ***Id.*** (quoting ***Williams v. State***, 544 So. 2d 782, 785 (Miss. 1987) . . . "Some probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence." ***Jones v. State***, 920 So. 2d 465, 476-77 (quoting ***Jordan v. State***, 728 So. 2d 1088, 1094 (Miss. 1998) . . . ); ***McIntosh v. State***, 917 So. 2d 78, 84 (Miss. 2005). "So long as a photograph has probative value and its introduction serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory." ***Dampier***, 973 So. 2d at 230 (citations omitted). *But see* ***McNeal v. State***, 551 So. 2d 151 (Miss. 1989)) (the solitary instance where this Court held a photograph, a close-up of the victim's partly decomposed skull, was gruesome and lacked an evidentiary purpose and was more prejudicial than probative). A photograph has a meaningful evidentiary purpose when it: (1) aids in describing the circumstances of the killing; (2) describes the location of the body or cause of death; or (3) supplements or clarifies witness testimony. ***Dampier***, 973 So. 2d at 230.

Similarly, autopsy photographs are admissible only if they possess probative value. ***Hodges v. State***, 912 So. 2d 730, 781-82 (citing ***Puckett v. State***, 737 So. 2d 322, 338 (Miss. 1999); ***Noe v. State***, 616 So. 2d 298 (Miss. 1993)). The comment to Mississippi Rule of Evidence 401 states that if there is any probative value, the rule favors admission of the evidence. ***Thorson***, 895 So. 2d 85, 120 (Miss. 2004).

***Chamberlin***, 989 So. 2d at 340.

¶154. At trial, the State qualified all of the autopsy photographs it intended to offer into evidence as being of assistance to the pathologist, Dr. Pojman, in explaining the types of injuries the victims suffered. The following line of questioning took place between the State and Dr. Pojman:

BY MR. WEATHERS:

Q. Before proceeding any further, would it be a fair statement, Doctor, to make to this jury that during the course of your examination of both Ms. Heintzelman and Mr. Hulett that a number of photographs were taken to

85

document not only what you saw and observed but also what occurred as you proceeded with both the external and also the internal examination?

A. There were numerous photographs taken by myself and also by law enforcement.

Q. All right. Would you have an estimate as to how many photographs were taken, say, of Ms. Heintzelman during the course of the examination that you're describing today?

A. I know I took probably around one hundred plus photographs. And then, again, law enforcement, I do not know how many they took.

Q. So quite a number there?

A. There are a large number, yes.

Q. All right. Would the same thing be true of Mr. Hulett?

A. That is correct. There's not as many but there are still quite a few.

Q. And before coming here today, is it not true that I asked you to simply select a few photographs that would be representative that would assist you in explaining the injuries that you saw to the jury?

A. That is correct.

In addition, throughout the State's questioning of Dr. Pojman, it repeatedly asked him if the specific photo that was about to be discussed and introduced into evidence would assist him in explaining to the jury the location, type, and number of injuries on the victims' bodies, and Dr. Pojman always answered in the affirmative.

¶155.  The thirteen autopsy photographs to which Gillett objects on appeal are those that were chosen by Dr. Pojman for the purpose of helping him describe to the jury the injuries the victims suffered.  A few of the photographs were introduced to show the initial state of the

victims' bodies as received by Dr. Pojman, and the remainder depicted different parts of the victims' bodies to illustrate the various injuries they suffered. The photographs were not repetitive; each depicted different injuries.

¶156. As announced in *Chamberlin*, "[t]he question as to each photograph is whether it: (1) had probative value and (2) aided in described [*sic*] the circumstances of the killing, described the location of the body and cause of death, or supplemented or clarified witness testimony." *Chamberlin*, 989 So. 2d at 341. Each picture at issue in the instant case satisfied these two requirements. Further, "[i]n order to exclude any photograph, the trial court would have been required to find as to any particular photograph that, pursuant to Mississippi Rule of Evidence 403, the probative value of such photograph was substantially outweighed by the danger of unfair prejudice." *Id.* Considering Rule 403 and the case record, we find that the trial court did not abuse its discretion in allowing the introduction of the autopsy photos at the guilt and penalty phases.[24]

## XVII. Whether, in light of all Gillett's previous claims, Gillett's death sentence is the product of an invalid penalty phase that violated his constitutional rights.

¶157. Gillett's next assignment of error is that his death-penalty sentence is the product of an invalid penalty phase. He argues that, based on the errors he has alleged regarding the penalty phase, "the execution of Mr. Gillett would amount to nothing more than the

---

[24] Gillett notes that he offered to stipulate to the identity of the victims and to their manner and cause of death. However, this Court has held that "the mere fact that the defense is willing to stipulate what the prosecution hopes to prove by admitting the photographs into evidence does not bar their admissibility." *Simmons v. State*, 805 So. 2d 452, 485 (Miss. 2001).

unreliable, arbitrary and capricious killing" which would be "intolerable under the Eighth and Fourteenth Amendment as well as Article Three, Section 28 of the Mississippi Constitution." Gillett emphasizes that the State has the burden in the penalty phase of proving aggravating circumstances beyond a reasonable doubt. He also points to the alleged "host of instructional errors" committed during the penalty phase.

¶158. Arguments like Gillett's cumulative-error argument, contending that the State failed to carry its burden of proof throughout the penalty phase and that the defendant was deprived of his due-process rights, have been addressed by this Court before. In ***Thorson v. State***, this Court explained:

> [The defendant] argues that in light of the previous issues, his sentence of death is the end result of an invalid penalty phase. Therefore, his execution would amount to an "arbitrary and capricious" killing in violation of the Eighth and Fourteenth Amendments to the United States Constitution as well as Article 3, Section 28 of the Mississippi Constitution. This argument amounts to a cumulative error argument. This Court has previously found no reversible errors. If there is "no reversible error in any part, so there is no reversible error to the whole." ***McFee v. State***, 511 So. 2d 130, 136 (Miss. 1987). *See also* ***Caston v. State***, 823 So. 2d 473, 509 (Miss. 2002); ***Hicks v. State***, 812 So. 2d 179, 195 (Miss. 2002). Therefore, this issue is without merit.

***Thorson***, 895 So. 2d at 114.

¶159. As the trial court did not commit any reversible errors in the penalty phase, Gillett's cumulative-error argument must fail. ***Id.*** *See also* ***Doss v. State***, 709 So. 2d 369, 401 (Miss. 1996).

**XVIII. Whether Gillett's death sentence is arbitrary, in violation of Mississippi Code Section 99-19-105(3)(a).**

¶160. Gillett's next assignment of error is that "in light of the totality of the preceding Claims, it is respectfully submitted it cannot seriously be contended that the execution of Roger Gillett would be anything less than the absurd and fatal culmination of an entirely arbitrary sentencing proceeding."

¶161. Aside from pointing to his preceding claims generally, Gillett does not specify why he believes his death sentence is arbitrary. He argues that "[c]ertainly, this Court has granted relief for arbitrariness on a record which evinces erroneous factors contributing to [a] death sentence less pervasive than the errors plain on the record at bar"; however, the cases he cites to support this proposition – *Walker v. State*, 740 So. 2d 873, 890 (Miss. 1999), and *Taylor v. State*, 672 So. 2d 1246, 1276 (Miss. 1996) – do not in fact support it. In *Walker*, in an effort to prove the aggravating circumstance of avoiding arrest, the State presented improper testimony regarding threats the defendant allegedly had made to witnesses and regarding the defendant's alleged affiliation with a gang, without proof that the defendant had made any threats or was a member of a gang. *Walker*, 740 So. 2d at 890. This Court found that the admission of the testimony was "an impermissible, arbitrary factor which the jury considered in its imposition of the death penalty" and thus remanded the case for a new sentencing hearing. *Id.* In *Taylor*, this Court found that the trial court erred with regard to the aggravating-circumstances jury instructions it gave, because three of the five aggravating-circumstances presented to the jury for consideration "lack[ed] the requisite proof or evidence

89

to support the jury's finding of [those] aggravating factors."[25]  *Taylor*, 672 So. 2d at 1274, 1276.

¶162.   Therefore, based on our review of the record and a finding that the cases Gillett cites are distinguishable from the instant case, we conclude that Gillett's sentence is not based on any impermissible, arbitrary factors.

**XIX. Whether Gillett's death sentence is excessive and disproportionate, in violation of Mississippi Code Section 99-19-105(3)(c).**

¶163.   Gillett's next assignment of error is that "there is a great deal about the crime at bar that makes the execution of the death sentence excessive and disproportionate; namely that if Roger Gillett is executed, he is executed based on legally insufficient aggravation and a finding of a statutory aggravator that, itself, is constitutionally insufficient to support a death sentence."  Gillett also reasserts his argument that the jury was "unconstitutionally deprived of adequate instruction concerning death-eligibility and death-selection . . . ."

¶164.   Mississippi Code Section 99-19-105(3)(c) requires this Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant[.]"  Miss. Code Ann. § 99-19-105(3)(c) (Rev.

---

[25] The *Taylor* Court explained:

> The State showed only conjecture, not evidence, that a kidnapping had occurred. Likewise, there was no evidence other than the prosecution's argument which would support a finding that the murder was committed for the purpose of avoiding or preventing the detection and lawful arrest of the defendant.  Finally, we are left solely with speculation that the victim's death was especially heinous, atrocious and cruel.

*Taylor*, 672 So. 2d at 1276.

2007). This Court has upheld the death penalty in cases involving capital murders committed during the commission of a robbery. *See, e.g., **Doss v. State***, 709 So. 2d 369 (Miss. 1997); ***Evans v. State***, 422 So. 2d 737 (Miss. 1982). Moreover, this Court recently upheld the death penalty of Chamberlin for committing the same crimes for which Gillett was convicted. ***Chamberlin***, 989 So. 2d 320 (Miss. 2008). Therefore, we find that Gillett's death sentence is neither excessive nor disproportionate.

**XX. Whether aggregate error requires reversal of Gillett's conviction and death sentence as a matter of federal constitutional law.**

¶165. Gillett's next argument is that "should this Court conclude that the previous claims do not mandate relief, in and of themselves, then . . . based on . . . federal constitutional law, Mr. Gillett is entitled to appellate relief on the basis of cumulative error." When the Fifth Circuit was presented with a defendant who, like Gillett, alleged a violation of his constitutional due-process rights by cumulative error, the Fifth Circuit explained:

> In ***Derden v. McNeel***, 978 F. 2d 1453, 1454 (5th Cir. 1992), *cert. denied*, 508 U.S. 960, 113 S. Ct. 2928, 124 L. Ed. 2d 679 (1993), the *en banc* court recognized an independent claim based on cumulative error only where "(1) the individual errors involved matters of constitutional dimensions rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" ***Id.***, quoting ***Cupp v. Naughten***, 414 U.S. 141, 147, 94 S. Ct. 396, 400, 38 L. Ed. 2d 368 (1973). Meritless claims or claims that are not prejudicial cannot be cannot be cumulated, regardless of the total number raised.

***Westley v. Johnson***, 83 F. 3d 714, 726 (5th Cir. 1996).

91

¶166. In reviewing Gillett's assignments of error, we found only one error and found that error to be harmless. Given those findings, and applying the standard set forth by the Fifth Circuit, we find no violation of Gillett's due-process rights based on cumulative error.

**XXI. Whether Mississippi Code Section 99-19-101 is unconstitutional.**

¶167. As his final assignment of error, Gillett argues that "Miss. Code Ann. 99-19-101, the capital sentencing mechanism in the State of Mississippi, violates his Eighth and Fourteenth Amendment rights in that the death penalty constitutes cruel and unusual punishment."

¶168. This Court previously has addressed this issue and has found that the death penalty as administered in Mississippi does not violate the U.S. Constitution. *Bennett v. State*, 990 So. 2d 155, 160-61 (Miss. 2008). Therefore, this issue is without merit.

## CONCLUSION

¶169. Based on the foregoing analysis, we affirm the convictions and sentences that Gillett received in the Circuit Court of Forrest County for the capital murders of Vernon Hulett and Linda Heintzelman.

**¶170. COUNTS I AND II: CONVICTIONS OF CAPITAL MURDER AND SENTENCES OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., RANDOLPH AND PIERCE, JJ., CONCUR. CHANDLER, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION; DICKINSON, J., JOINS PART II. LAMAR J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, J.; KITCHENS, J., JOINS IN PART.**

**CHANDLER, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶171. I concur in part and in result with the majority opinion. I write separately to explain my position in this case. The trial court erred by admitting the expert-witness testimony of William Jones, the DNA Section Chief of the Mississippi Crime Laboratory, as the testing methodology failed to comport with the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), standards. At trial, Jones testified that the test results allegedly showed that blood on a tennis shoe recovered from the Kansas landfill matched Linda Heintzelman's blood. The admission of this evidence was erroneous because it failed to meet the standards in *Daubert* adopted by this Court in *Mississippi Transportation Commission v. McLemore*, 863 So. 2d 31 (Miss. 2003). However, even under the heightened standard of review in death-penalty cases, this admission was harmless error due to the overwhelming weight of the evidence presented at trial against Gillett. It is for these reasons that I concur in part and in result with the majority opinion.

I.

¶172. The standard of review for a conviction of capital murder and sentence of death requires heightened scrutiny. *Brown v. State*, 890 So. 2d 901, 907 (Miss. 2004). "While we may apply different standards for different questions – for example, a review of the admission of evidence – we always apply a heightened scrutiny." *Id*. "Under this method of review, all doubts are to be resolved in favor of the accused because what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Loden v. State*, 971 So. 2d 548, 562 (Miss. 2007).

II.

93

¶173. In ***Ross v. State***, 954 So. 2d 968, 992 (Miss. 2007), this Court stated "[t]he admissibility of evidence rests within the discretion of the trial court, and reversal is appropriate only when a trial court commits an abuse of discretion resulting in prejudice to the accused." ***Ross,*** 954 So. 2d at 992. This Court will reverse where the trial court's discretion has been abused and a substantial right of a party has been affected. ***Id***. at 996. This Court is mindful that a trial court's discretion must be exercised within the confines of the Mississippi Rules of Evidence. ***Id***. *See* ***Kolberg v. State***, 829 So. 2d 29, 55 (Miss. 2002) (admissibility of evidence rests within the discretion of the trial court and this Court will reverse where the trial court has abused its discretion); Miss. R. Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . .")

¶174. In ***McLemore***, 863 So. 2d at 38, this Court analyzed the admission and exclusion of expert testimony. This Court adopted the test as stated in ***Daubert***, and as modified in ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), to determine admissibility of expert-witness testimony. ***McLemore***, 863 So. 2d at 35.

¶175. When the issue arises of whether a trial court erred by the admission or exclusion of expert testimony, Mississippi Rule of Evidence 702 provides the framework for analysis. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

94

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702. Under Rule 702, expert testimony may be admitted where it is determined to be both relevant and reliable. ***Ross***, 954 So. 2d at 996 (citing ***McLemore***, 863 So. 2d at 38). Relevant testimony is that which assists the trier of fact in understanding or determining a fact at issue. ***Id***. Reliable testimony is when an expert's testimony is "based on the methods and procedures of science, and not merely on subjective beliefs or unsupported speculation." ***Id***. at 996-97. *See **Daubert***, 509 U.S. at 587.

¶176. This Court also considers the ***Daubert*** factors, which are: (1) whether the theory can be, and has been, tested; (2) whether the theory has been published or subjected to peer review; (3) any known rate of error; and (4) the general acceptance that the theory has garnered in the relevant expert community. ***Edmonds v. State***, 955 So. 2d 787, 791 (Miss. 2007) (citing ***Daubert***, 509 U.S. at 593-94).

¶177. The testimony presented at the pretrial ***Daubert*** hearing, as it related to the testing methods used on a blood sample stored in a red-top vial, did not meet ***Daubert*** standards. Jones's expert testimony proved to be irrelevant and unreliable, therefore, his testimony and consequent test results should have been excluded at trial. The blood-test results were woefully short and were not based on reliable principles or methodologies, which in turn undermined the relevance of the results.

¶178. Jones testified about the various types of tops for blood-sample tubes. The vast majority of the crime lab's testing samples have either purple or yellow tops. Purple-top tubes

contain EDTA, a preservative. Yellow-top tubes also have a preservative in them. Red-top tubes, in contrast, contain no preservative. This means that a blood sample collected and stored in a red-top tube has nothing to prevent blood from clotting, from producing bacteria, or from decomposing in the tube.

¶179. The State requested that the crime lab compare two blood samples from the victims with blood found on a tennis shoe to determine whether there was a DNA match. Jones testified that, although he characterized the blood samples of Heintzelman and Hulett on his reports to be "poor" and "putrefied," respectively, the DNA evidence on the shoe matched Heintzelman's blood sample.

¶180. Jones also testified about the written protocol used by the crime lab when conducting testing. He said the crime laboratory has a written protocol for DNA testing. The protocol has been tested in validation studies and is accepted as a reliable method of collecting, storing, and analyzing blood samples. While the protocol does not explicitly exclude red-top-tube testing, the protocol, according to Jones, specifically mentions that purple-top tubes are preferred for samples. Jones stated that he did not know of a validation study that explicitly permitted the use of red-top tubes for DNA comparisons. Jones stated that a purple-top tube was preferred, but that he was "absolutely convinced that if you get a DNA profile from a red-top tube, that it would be the same as from the purple-top tube of that individual." He provided no validation studies to support this statement.

¶181. Dr. D'Eustachio also testified at the hearing and expressed his opinion that the crime lab (1) did not follow the testing standards contained in an FBI Quality Assurance Audit for

96

Fornesic DNA and Convicted Offender DNA Databasing, and (2) the results of the DNA testing were not based on reliable scientific principles or methodology. He stated that performing an analysis without a validation protocol would be similar to an "experiment." Likewise, the test results, in Dr. D'Eustachio's opinion, were unreliable due to an irregularity in the peak heights in the results. Further, even if the results were explainable with reasons for the causes of the irregular pattern, Dr. D'Eustachio opined that a validation study needed to be conducted. He stated:

> I couldn't see any regularity in the pattern or any other symptom that would even let me make a good hypothesis. And even if I could make a good hypothesis as to what might be causing this, of course one would then need to do a validation study in which one tried to repeat those conditions and cause the same kind of abnormal variation to occur again, then at least we would understand what was causing it.

Dr. D'Eustachio determined that the test results were irregular and could not be interpreted to a reasonable degree of medical certainty.

¶182. Because the DNA testing failed to follow the appropriate protocol and was not based on any validation study for red-top tubes, the testing and, ultimately, the results failed to meet *Daubert* standards. *Edmonds*, 955 So. 2d at 791. The DNA evidence was not collected and tested in compliance with reliable scientific principles or methodologies.

¶183. For these reasons, the trial court erred by admitting the State's expert testimony on its DNA analysis.

III.

¶184. We must now determine whether admitting this evidence was harmless error. In *Kolberg v. State*, 829 So. 2d 29, 67 (Miss. 2002), a death-penalty case, this Court stated the basic test for harmless error as 'the inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether the error was unimportant in relation to everything else the jury considered on the issue in question." *Kolberg*, 829 So. 2d at 67 (quoting *Tanner v. State*, 764 So. 2d 385, 399-400 (Miss. 2000)).

¶185. This test for harmless error reaches back to the United States Supreme Court case *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). "The *Chapman* test is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Thomas v. State*, 711 So. 2d 867, 872 (Miss. 1998). "Nonstructural, constitutional errors in the face of 'overwhelming evidence of guilt' are harmless errors." *Brown v. State*, 995 So. 2d 698, 704 (Miss. 2008). In *Brown*, this Court further stated:

> The U.S. Supreme Court "ha[s] repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, 'most constitutional errors can be harmless.'" *Washington v. Recuenco*, 548 U.S. 212, 218, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (quoting *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

*Brown*, 995 So. 2d at 704.

¶186. In *Holland v. State*, 587 So. 2d 848, 865 (Miss. 1991), this Court determined whether the admission of a wash cloth was error in a death-penalty case. While the Court determined that the trial court erred by admitting a wash cloth recovered from a grave because it lacked

98

connection to Holland or his home, the admission was harmless because of the overwhelming weight of the evidence against the defendant. *Id*.

¶187. Like this Court's decision in ***Holland***, the admission of the expert-witness testimony at Gillett's trial was harmless error based on the overwhelming weight of the evidence. Indeed, it is reasonable to conclude that the erroneous admission of the DNA comparison results of the victims' blood to the bloody tennis shoe recovered from the Kansas landfill had little or no effect on the guilty verdict reached by the jury.

¶188. Investigation led to the recovery of seven garbage bags of items from a Kansas landfill. Employees from the landfill stated that Gillett and a female had disposed of items on two occasions. Personal property belonging to Hulett and Heintzelman were recovered from the garbage bags. The recovered items included Hulett's wallet with his driver's license; Heintzelman's wallet with her driver's license; a work shirt and pants with Hulett's name on them; a blood-stained crocheted pillow, later determined to match pillows from Hulett's and Heintzelman's residence in Hattiesburg; and New Balance tennis shoes with blood-like stains.

¶189. In Hattiesburg, law enforcement officers discovered a shoe print with a reddish stain at Hulett's and Heintzelman's residence, temporarily shared with Gillett and his girlfriend, Lisa Chamberlin. One of the tennis shoes recovered from the Kansas landfill matched the shoe print in Hattiesburg and was determined to be the source of the print. Simply from the evidence recovered at the landfill, whether the blood on the tennis shoe matched Heintzelman's blood was inconsequential. These facts, in conjunction with all the other competent evidence put forth, render the improper DNA evidence insignificant.

99

¶190. At trial, other overwhelming evidence was produced for the jury's consideration. Some of this evidence included statements from Gillett's friends that Gillett said that he had taken the truck, killed the owners, and the owners were in the back of the truck. Law enforcement officers found Heintzelman's truck and a freezer containing the victims' bodies at the Gillett farm. Hulett's mother identified the freezer as belonging to the victims. Gillett's fingerprints were on the freezer and on the tape securing the freezer lid in a closed position. Also, the victims' home in Hattiesburg showed signs of foul play such as blood-like stains, ripped-out carpeting, and a tampered safe.

¶191. Given the overwhelming evidence produced at trial, the admission of the DNA testimony was harmless.

IV.

¶192. For the above stated reasons, I concur in part and in result with the majority opinion.

**KITCHENS, JUSTICE, DISSENTING:**

¶193. Though not alleged in the indictment, the State chose to proceed on the theory that Roger Gillett committed capital murder by killing Linda Heintzelman and Vernon Hulett while robbing Heintzelman of her Dodge pickup truck. At trial, the State failed to adduce even the slightest evidence that the taking of the truck was in any way related to the murders. Having failed to prove that Gillett robbed Heintzelman of her vehicle, or that the murders were committed "during the commission of" this alleged robbery, this conviction of capital murder should not stand. Accordingly, I respectfully dissent and would reverse Gillett's conviction.

¶194. However, even if the State had proven that a robbery occurred, and that the robbery and murders constituted a "continuous transaction" sufficient to prove capital murder, the Court would be required to reverse the sentence of death for two additional reasons. First, the majority correctly finds that it was error for the jury to consider a previous violent felony as an aggravator, but concludes that the error was harmless. I respectfully disagree that such error can be harmless, as we are an appellate court without authority to reweigh aggravating and mitigating circumstances. That is the business of juries, not jurists. Any legislative mandate to the contrary is an unconstitutional directive on a purely judicial prerogative.

¶195. Second, as with the robbery aggravator, the State failed to adduce any proof that Gillett committed the murders in an effort to avoid arrest. Indeed, the State did not contend that Gillett's motive in killing his victims was to avoid apprehension by authorities. Therefore, it was error to instruct the jury to consider this as an aggravating circumstance.

¶196. A death sentence based on three invalid aggravating factors should be reversed.

I.

¶197. The State attempted to prove that the murders occurred while "engaged in the commission of" a robbery, and that the property that was the object of the robbery was Heintzelman's truck. Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2006). Robbery requires "(1) felonious intent, (2) force or putting in fear as a means of effectuating the intent, and (3) by that means taking and carrying away the property from his person or in his presence." *Lima v. State*, 7 So. 3d 903, 909 (Miss. 2009) (quoting *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005)). While it is true that "the intent to rob . . . can be shown from the facts surrounding the

101

crime," *Lima*, 7 So. 3d at 909, there must be an evidentiary basis for such intent, and a jury is not permitted to rely on mere speculation or conjecture. *Brazzle v. State*, 13 So. 3d 810, 818 (Miss. 2009).

¶198. Gillett argues that the State failed to meet its burden of providing such an evidentiary basis because there was no proof that he or his codefendant had formed the intent to rob Heintzelman of her truck before the murders took place. The majority rejects Gillett's claim by concluding that there was evidence that the taking of the truck and the murders were parts of the same "continuous chain of events," yet the facts in evidence indicate an obvious break in the chain.

¶199. According to the State's evidence, the murders occurred on or about March 20, 2004; but Gillett and his codefendant, Lisa Jo Chamberlin, did not remove Heintzelman's truck from the residence until days later. There was uncontradicted testimony that Gillett and Chamberlain remained in Hattiesburg for days following the murders, visiting relatives and attending to other matters, while the truck remained in its owner's driveway.

¶200. Hulett's nephew, Michael Hester, testified that he visited his uncle's home on March 20, and although Heintzelman's truck was in the driveway, only Gillett and Chamberlin were present. Gillett told Michael that Heintzelman and Hulett had taken a trip to the Gulf Coast. On March 21, Michael again visited his uncle's house, and again, Gillett and Chamberlin were the only persons present. On this occasion, he noticed that the living room carpet was missing. Gillett told Michael that Hulett had come into some money while on the Coast and would be bringing new carpet back with him.

102

¶201. That afternoon, Gillett and Chamberlin walked to Michael's house, where he lived with his grandmother, Caroline Hester. Ms. Hester was Gillett's aunt and Hulett's mother. While at the Hester home, Gillett offered to sell Michael the stereo from Chamberlin's wrecked vehicle. Michael accepted the offer, and Gillett and Michael then moved the stereo from Chamberlin's car to Michael's car. Gillett and Chamberlin ate dinner with the family before leaving.

¶202. Two days later, on March 23, Gillett and Chamberlin returned to the Hester home. Gillett finished installing the car stereo and played basketball with Michael while Chamberlin took a shopping trip to Wal-Mart with Ms. Hester. Just as they had two days before, Gillett and Chamberlin ate dinner with the family before returning to Hulett's and Heintzelman's residence.

¶203. The next time anyone heard from or saw Gillett and Chamberlin was on March 26, 2004. That night, Gillett called Ms. Hester and told her that Hulett and Heintzelman had driven him and Chamberlin to Kansas. Gillett was indeed in Kansas; however, Gillett was driving Heintzelman's truck, and her and Hulett's corpses were in a freezer in the back of the truck. On March 26, Gillett met two of his friends at a gas station in Victoria, Kansas, and told one of them that "he had taken the pickup and the owners were in the back of it." Gillett then asked whether he could store the truck at his friend's house and said that "he needed help to get rid of [it] . . . because there was [sic] two bodies in the back."

¶204. These facts do not support a conviction of capital murder on the theory that Gillett murdered Heintzelman and Hulett while robbing Heintzelman of her truck. Multiple activities

103

and events, disconnected from and unrelated to the homicides, transpired over a period of several days before the defendants departed the victims' residence in Heintzelman's pickup truck. The State has proven absolutely no connection between the killing of the two victims and the theft of the vehicle. Therefore, it cannot be said that the defendants took the vehicle from the presence or person of Heintzelman or Hulett as part of a "continuous chain of events." The State may have proven that Gillett and Chamberlin killed two people. The State also may have proven that these defendants stole a truck that belonged to one of these decedents, a crime commonly known as auto theft. Miss. Code Ann. § 97-17-42 (Rev. 2006). What the State has not proven is that they killed anyone while "engaged in the commission of . . . robbery." Miss. Code Ann. § 97-3-19(2)(e).

¶205. One of the first cases to address this issue was *Pickle v. State*, 345 So. 2d 623 (Miss. 1977). Pickle was convicted of capital murder for killing during the commission of a rape. *Id.* The victim was found nude from the waist down, and forensic evidence revealed that she had been raped before being shot in the chest. *Id.* at 625. On appeal, Pickle argued that to sustain a conviction for capital murder, the State was required to prove that the victim's death occurred during the rape. *Id.* This Court looked to outside authorities, including a general discussion from the legal encyclopedia *American Jurisprudence*, and held that "where the two crimes are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." *Id.* at 627.

¶206. As the majority notes in footnote 13 of today's opinion, the *Pickle* decision included language from *American Jurisprudence* that "[t]he felony-murder doctrine does not apply,

104

however, when the determination to steal property of the victim is not formed until after the homicide." *Id.* at 626 (quoting 40 Am. Jur. 2d *Homicide* § 73 (1968)). The majority then states that the *Pickle* court was not adopting the law as defined by *American Jurisprudence*. While the particular sentence in question was dictum, this Court did rely on *American Jurisprudence* in formulating its ultimate holding. Moreover, this Court has since adopted similar language from that very block quote and has held that "the underlying crime begins where an indictable attempt is reached." *Goff v. State*, 14 So. 3d 625, 650 (Miss. 2009) (quoting *Pickle*, 345 So. 2d at 626 (quoting 40 Am. Jur. 2d *Homicide* § 73). *See also, e.g., Moody v. State*, 841 So. 2d 1067, 1091 (Miss. 2003) (quoting same); *Simmons v. State*, 805 So. 2d 452, 477 (Miss. 2001) (quoting same); *Duplantis v. State*, 708 So. 2d 1327, 1342 (Miss. 1998) (quoting same).

¶207. Attempt to commit a crime requires an *intent* to commit the crime. *Brooks v. State*, 18 So. 3d 833, 841 (Miss. 2009) (citing *Hughes v. State,* 983 So. 2d 270 (Miss. 2008); Miss. Code Ann. § 97-1-7 (Rev. 2006)). Therefore, if "the underlying crime begins where an indictable attempt is reached," the underlying crime cannot have begun until criminal intent is formed. *Goff*, 14 So. 3d at 650. In other words, "[t]he felony-murder doctrine does not apply . . . when the determination to steal property of the victim is not formed until after the homicide." *Pickle*, 345 So. 2d at 626 (quoting 40 Am. Jur. 2d *Homicide* § 73, at 366-67).[26]

---

[26]The current version of *American Jurisprudence* does not contain the language that "the felony-murder doctrine does not apply, however, when the determination to steal property of the victim is not formed until after the homicide." 40 Am. Jur. 2d *Homicide* §39 (2008). Interestingly, however, the encyclopedia relies on this Court's holding in *Pickle* for

Here, obviously, a significant period of time passed between the homicides and the theft of the vehicle.

¶208. This Court has addressed the issue of intent in several cases involving capital murders based on killings committed during the commission of robbery. Consistently, this Court has held that a jury reasonably could infer that intent to rob existed at the time of the murders *only* when the killing and the taking of the property occurred simultaneously, or when the acts occurred within mere moments of each other. *See, e.g., Lima*, 7 So. 3d at 909 (defendant took property from the victim's pockets as he lay dying); *Shaw v. State*, 915 So. 2d 442, 449 (Miss. 2005) (defendant robbed the victim "immediately after" shooting him); *Walker v. State*, 913 So. 2d 198, 212, 223 (Miss. 2005) (defendant took the victim's car immediately after the killing, and defendant confessed that his intent was to rob the victim); *Knox v. State*, 805 So. 2d 527, 530-32 (Miss. 2002) (defendant was found carrying victim's keys the same day she was murdered); *Simmons*, 805 So. 2d at 470, 477-78 (Miss. 1999) (immediately after shooting victim, defendant took victim's companion's clothes and jewelry); *Duplantis*, 708 So. 2d at 1341 (defendant took the victim's property "immediately following" the victim's death); *West v. State*, 463 So. 2d 1048, 1050-51, 1055 (Miss. 1985) (killing occurred while defendant and his accomplice were robbing victim of his vehicle, although the vehicle was not taken until victim was dead).

_____

the proposition that "[g]enerally, to sustain a conviction of murder in the first degree under a felony-murder statute, it must be shown that there is a direct causal relationship between the homicide and the commission of the other felony." *Id.* (citing *Pickle*, 345 So. 2d 623).

¶209. In the instant case, there was a clear break between the killings and the taking of the truck. Hulett and Heintzelman were killed on March 20, 2004, but Gillett and Chamberlin remained in Hattiesburg for days afterward. While Heintzelman's truck remained in her driveway, Gillett and Chamberlin visited relatives, went shopping, played basketball, installed a car stereo, and had several meals. There was no evidence that Gillett or Chamberlin took possession of the truck until they fled Hattiesburg on or shortly before March 26. Unlike the cases cited above, the time between the killing and the taking of the property was significant, and it cannot be said that "the intervening time between the time of the murder and the time of taking of the property formed a continuous chain of events." *West*, 463 So. 2d at 1055 (Miss. 1985). Therefore, the State failed to prove capital murder, and Gillett's conviction should be reversed.

II.

¶210. Even if the State had met its burden of proof in the guilt phase of the trial, reversal of the death sentence still would be required. The majority correctly finds that the jury should not have been allowed to consider that Gillett previously had committed a violent felony, but finds such error harmless. I respectfully cannot agree, for in the face of even a single invalid aggravating circumstance, this Court does not have the authority to determine that the penalty of death is appropriate.[27]

---

[27]I join Justice Lamar's separate opinion in part, only to the extent that she would reverse Gillett's death sentence.

¶211. Although the legislature has "instructed" this Court to perform a reweighing or harmless-error analysis upon finding an invalid aggravator, such a mandate is an unconstitutional infringement on judicial prerogatives. *See* Miss. Const. art. 1, §§ 1, 2 (providing for separation of governmental powers); Miss. Const. art. 6, § 144 ("The judicial power of the State shall be vested in a Supreme Court and such other courts as are provided in this Constitution."); Miss. Const. art. 6, § 146 ("The Supreme Court shall have such jurisdiction as properly belongs to a court of appeals . . . .").[28] *See also, e.g.,* **Long v. McKinney**, 897 So. 2d 160, 183 (Miss. 2004) ("[T]his Court has been charged with the responsibility, and granted the authority, over all things judicial within this state."); **Newell v. State**, 308 So. 2d 71, 76 (Miss. 1975) ("[The Mississippi constitution] leaves no room for a division of authority between the judiciary and the legislature as to the power to promulgate rules necessary to accomplish the judiciary's constitutional purpose."). Only a unanimous jury may impose a sentence of death, and it must do so in writing, specifying that sufficient aggravating circumstances exist and that these are not outweighed by any mitigating

---

[28]In 1994, following this Court's announcement in **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992), that it was without statutory authority to reweigh aggravating and mitigating circumstances, Mississippi Code Section 99-19-105 was amended to provide:

> Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105(3)(d).

circumstances. Miss. Code Ann. § 99-19-101(3) (Rev. 2007). Such power is properly left in the hands of a jury before whom the case is tried, and not an appellate court.

¶212. The constitutionality of Mississippi Code Section 99-19-105(3)(d) notwithstanding, reversal is required because the State failed to adduce sufficient proof of three of the four aggravating circumstances considered by the jury. First, as discussed above, there was no proof – only argument – that the killings were committed during the commission of a robbery. Miss. Code Ann. § 99-19-101(5)(d). Second, as the majority recognizes, there was no proof that Gillett previously had committed a violent felony. Miss. Code Ann. § 99-19-101(5)(b). Third and finally, nothing in the record supports a finding that Gillett and Chamberlin committed the murders "for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Miss. Code Ann. § 99-19-101(5)(e).

¶213. At the sentencing hearing, the State did not present any new evidence beyond what had been adduced during the guilt phase. In opening and closing arguments, the prosecutor made absolutely no assertion that Heintzelman and Hulett were killed so that Gillett and Chamberlin might avoid apprehension. The State argues on appeal that it was reasonable to conclude that the victims were murdered "to avoid any investigation into the robbery." This would require a finding that Gillett and Chamberlin first robbed the couple and then killed them in order to eliminate witnesses to the robbery. But, as discussed previously, there is zero evidence that Gillett and Chamberlin took anything belonging to the victims before March 26, nearly a week after their deaths.

109

¶214. The majority relies on *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983), for the proposition that "it may be reasonably inferred that a substantial reason for killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities." However, in the *Leatherwood* case, there was testimony that the defendant and his accomplices planned to "leave no witnesses." *Id.*

¶215. In the instant case, there was no similar evidence. To the contrary, the only evidence of Gillett's motive was that he was angry at Heintzelman and Hulett due to their involvement in an automobile accident. Because the State failed to adduce even a scintilla of evidence that Gillett and Chamberlin had been killed to avoid arrest, it was error to submit this aggravator to the jury. *Taylor v. State*, 672 So. 2d 1246, 1275-76 (Miss. 1996).

III.

¶216. For purposes of capital murder, "in the commission of" requires, at minimum, some temporal relationship between one of the enumerated felonies and the killing. Unlike any other case this Court has reviewed, the State presented no evidence that Gillett or his codefendant had formed an intent to take the property at issue at the time of the killings. To the contrary, the uncontradicted evidence indicates that Gillett and Chamberlin killed their victims days before taking possession of the truck. Thus, the jury could only speculate regarding the defendants' criminal intent at the time of the killings, and speculation alone will not support a verdict.

¶217. As for the death sentence, it too fails appellate review. In cases involving the death penalty, heightened scrutiny requires reversal on even one invalid aggravator, and any

110

legislative mandate to the contrary is an unconstitutional encroachment on judicial authority. Yet, in the instant case, three of the four aggravating circumstances were impermissibly presented to the jury. Therefore, even if there were sufficient evidence to support a conviction for capital murder, the sentence would have to be reversed.

¶218. For these reasons, I respectfully dissent.

**DICKINSON, J., JOINS PART II OF THIS OPINION.**

**LAMAR, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶219. The majority finds that the trial court erred in allowing the jury to consider the "previous violent felony" aggravator, but finds such error to be harmless. (Maj. Op. at ¶108). I respectfully disagree. The majority fails to consider the United States Supreme Court case of ***Brown v. Sanders***[29] in which the Court ruled that "[i]f the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal[.]" In this case, the majority correctly finds that the jury considered an invalid aggravating factor. But this error was *not* harmless because the evidence in support of the invalid aggravating factor – the fact that Gillett had been convicted of attempted aggravated escape from custody in Kansas – is evidence that otherwise would not have been before the jury. I would affirm Gillett's conviction of capital murder, but would reverse Gillett's sentence of death and remand for a new sentencing hearing.

**DICKINSON, J., JOINS THIS OPINION. KITCHENS, J., JOINS THIS OPINION IN PART.**

---

[29]546 U.S. 212, 220-21, 126 S. Ct. 884, 163 L. Ed. 2d 723 (2006).

# APPENDIX

## <u>DEATH CASES AFFIRMED BY THIS COURT</u>

*Goff v. State,* 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State,* 989 So. 2d 320 (Miss. 2008).

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

*Howell v. State,* 860 So. 2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

\**Shell v. State*, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***\*Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***\*Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***\*Jones v. State***, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
AND SENTENCE PHASE

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
### FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# <u>ON SENTENCING PHASE ONLY</u>

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* *Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.